## HENRY M. WALKER vs. BALDWIN & FRICK and JOHN W. FRICK, Individually.

*Action by Real Estate Broker Against Another for Division of Commissions—Evidence—When Broker is Procuring Cause of Sale—Instructions.*

Evidence as to statements concerning the subject matter of a controversy made by the defendant in the course of conversation with third parties and not in the presence of the plaintiff, is not admissible.

A real estate broker is not entitled to commissions for making a sale of property unless he is the procuring cause of the sale. The mere fact that he introduces or discloses the name of the person with whom negotiations for a sale are begun, does not entitle him to commissions unless those negotiations are the ultimate cause of the sale. If such negotiations are wholly broken off and abandoned, and afterwards another party induces the same person to purchase the property, the first broker is not entitled to commissions on the sale so made.

When the question is whether a certain broker was the procuring cause of the sale of land, the purchaser may testify as to the circumstances under which he bought the property.

When the trial Court states that certain testimony, which had been admitted without objection, would on motion be excluded, but a motion to exclude is not afterwards made, no objection to the testimony can be made on appeal.

A defendant in an action to recover half of the commissions on the sale of property had testified that his agreement with the plaintiff in regard to commissions related only to the sale of the M lot and not to the sale of another lot, commissions on which were sued for in this case. He was afterwards asked, "Did that agreement extend to any other property than the M lot?" His answer was, "Not that I know of." *Held*, that although this question was leading, since it embodied a material fact and could be answered by a simple negative or affirmative, yet, in this case, since the fact had been proved before and afterwards, the appellant was not injured by the allowance of the question.

In an action by one real estate broker against another to recover one-half of the commissions paid for effecting a sale of certain land, the plaintiff's evidence was that there was an express agreement between the parties to divide commissions in case S. the purchaser, bought the land, and that even if there was no such express agreement, yet the plaintiff was the procuring cause of the sale by having introduced S.

and called his attention to the property, and that he was therefore enti-
tled, under the usage among brokers, to a division of the commissions.
Defendant's evidence was that the agreement to divide commissions
related to another piece of property which S. did not buy; also that, al-
though S. was brought into communication with defendant by the plain-
tiff, yet the negotiations with him then begun were broken off and
abandoned by S. on account of his inability to procure the necessary
funds, and that subsequently, the defendant sold the property to a third
party whom he believed to be the principal, and that defendant did not
know until after the transaction was closed that this third party was
acting for S., and that the sale was really effected by this third party,
who enabled S. to procure the purchase money.  *Held*, that there was
evidence in the case to support the contentions of both the plaintiff and
the defendant, and that the questions raised were fully and fairly sub-
mitted to the jury under the instructions granted.

In an action by a real estate broker to recover one-half commissions from
another, the plaintiff is not entitled to recover compensation for his
services when there is no evidence of any agreement to compensate for
services, which is a different thing from a division of commissions un-
der the usage of real estate brokers.

*Decided November 15th, 1907.*

Appeal from the Court of Common Pleas (STOCKBRIDGE, J.)

*Plaintiff's 1st Prayer.*—The plaintiff prays the Court to rule
as a matter of law that if the negotiations for the sale of the
property mentioned in this cause were begun through the
plaintiff's intervention, and that the same culminated in the
sale of the property, or if the sale was actually made by or
through the information obtained through the plaintiff or his
agents or assistants, then the verdict must be for the plaintiff.
(*Rejected.*)

*Plaintiff's 2nd Prayer.*—The plaintiff prays the Court to in-
struct that if the plaintiff actually commenced work looking to
a sale of the property mentioned in the proceedings in this
case and as a result of such work the sale was made, then the
verdict must be for the plaintiff, even though subsequent trans-
actions were carried on and consummated by the defendants
apart from the plaintiff.  (*Rejected.*)

*Plaintiff's 3rd Prayer.*—The plaintiff prays the Court to in-

struct, that if the Court sitting as a jury finds from the evidence that the plaintiff introduced the purchasers of the property to the defendants or those for whom and with whom they acted and gave the defendants notice of negotiations between the plaintiff and his agents and the subsequent purchaser, and that the said sale was made to said purchaser as a result of said introduction by the plaintiff and negotiations conducted by him, then the verdict must be for the plaintiff.   (*Granted.*)

*Plaintiff's 4th Prayer.*—The plaintiff prays the Court to instruct, that if the sale of property mentioned in the proceedings in this case was made through the bringing of the parties together by the plaintiff, and if such bringing together of the parties was the procuring cause of said sale, then the plaintiff is entitled to recover even though the sale may have been effected by direct treaty between the defendants and the subsequent purchaser or his representatives other than the plaintiff.   (*Granted.*)

*Plaintiff's 5th Prayer.*—The plaintiff prays the Court, sitting as a Court and jury, to rule as a matter of law, that if it shall be found that the plaintiff was employed by the owners of the property mentioned in this case, either directly or through their duly authorized agents, and that the plaintiff presented the said property to a certain Sylvanus Stokes, and then informed the said defendants that he had so presented it, and that the property was sold to the said Stokes by the defendants subsequently, that the plaintiff is entitled to recover such a sum as may have been agreed upon between the plaintiff and the said defendants, provided the Court sitting as a jury shall further find that the presentation of the property to the said Stokes was the foundation from which the negotiations that led to the sale being made was begun.   (*Rejected.*)

*Plaintiff's 6th Prayer.*—The plaintiff prays the Court to rule as a matter of law that if the defendants had a beneficial interest in the property, or its sale that it is immaterial whether the defendants had a legal or other title to the property, but if the defendants employed the plaintiff to procure a purchaser for the property spoken of in this case and the plaintiff did

procure a purchaser for said property, and the said property was sold by the defendants to a purchaser procured by the plaintiff, then the verdict must be for the plaintiff. (*Rejected.*)

*Plaintiff's 7th Prayer.*—If the Court sitting as a Court and jury shall find from the evidence that the plaintiff is entitled to recover commissions in this case, then the amount of such commission shall be equal to what is usual and customary to pay brokers in Baltimore City for procuring a purchaser for property of similar character and value, unless it further find from the evidence that a different compensation was agreed upon by and between the plaintiff and the defendants, in which event should the Court sitting as a jury so find, then it shall find for the compensation agreed upon, if it shall find that there was any such agreement. (*Granted.*)

*Plaintiff's 8th Prayer.*—If the Court sitting as a jury shall find from the evidence that there. was an agreement between the parties to this case, whereby the defendants were to compensate the plaintiff for the services of said plaintiff in connection with the sale of the property mentioned in this case, to the said Sylvanus Stokes, then the verdict must be for the plaintiff even though the Court sitting as a jury shall find that the defendants did not own the property and had no authority from the owners of said property to enter into any such agreement. (*Rejected.*)

*Plaintiff's 9th Prayer.*—If the Court sitting as a jury shall find from the evidence that there was an agreement between the parties to this cause to make any division of the commissions or profits arising from the transactions mentioned in this case, then the verdict must be for the plaintiff, without regard to the fact of whether or not the plaintiff was a licensed real estate broker and as such entitled to commissions in accordance with the usual allowance to such brokers. (Granted after modifying by inserting words "commissions or" before "profits.")

*Plaintiff's 10th Prayer.*—The plaintiff prays the Court to instruct itself sitting as a jury that even though it shall find that the sale of the property made by the defendants to the said

Sylvanus Stokes as alleged in this case, was made by the defendants themselves by their own individual efforts or by their own efforts aided by other agents then their verdict must be for the plaintiff if it shall further find that the plaintiff first interested the said Stokes in the said property and fully informed the defendants of the same, and laid the foundation upon which said sale was ultimately made.    (*Rejected.*)

*Defendants' 1st Prayer.*—The defendants pray the Court to rule as a matter of law that there is no evidence in this case legally sufficient to entitle the plaintiff to recover, and that therefore the verdict of the Court, sitting as a jury, must be for the defendants.    (*Rejected.*)

*Defendants' 2nd Prayer.*—The defendants pray the Court to rule as a matter of law that there is no evidence in this cause legally sufficient to show any subsisting agreement on the part of the defendants to divide commissions with the plaintiff, or with Riordan, acting for the plaintiff, on a sale of the property at the northeast corner of Baltimore and Hanover streets, at the time the said property was sold by the defendants, or to show that the plaintiff, or Riordan acting for the plaintiff, was the procuring cause of the sale ultimately made by the defendants of the property in question and that therefore the verdict of the Court, sitting as a jury, must be for the defendants. (*Rejected.*)

*Defendants' 3rd Prayer.*—The defendants pray the Court to rule as a matter of law that even if the defendants, or either of them, at or before the purchase by them of the strip at the northeast corner of Baltimore and Hanover streets, agreed with the plaintiff, or with Riordan acting (known or unknown to the defendants) for the plaintiff, that in case Stokes was located through either the defendants or the plaintiff, on the northeast corner of Baltimore and Hanover streets, that then the plaintiff and the defendants would divide commissions, still, as it appears from the uncontradicted evidence in this cause that Stokes, upon being informed of the purchase by the defendants of the said corner lot, gave up the idea of acquiring said corner and discontinued negotiations therefor, and that Rior-

dan notified the defendant Frick of this fact; and since it
further appears from the uncontradicted evidence that the sale
subsequently made by the defendants to Stokes of the strip at
the said northeast corner, was the result of new negotiations,
thereafter opened with the defendants by Orem and Forsythe,
acting for a principal then unknown to the defendants, which
principal subsequently proved to be Stokes, who had taken up
the matter of said purchase anew upon the solicitation of Orem
and Forsythe, so that the said sale to Stokes was made entirely
through the instrumentality of Orem and Forsythe, and was in
no way referable to either the plaintiff or Riordan; that there-
fore the plaintiff is not entitled to recover, and the verdict of
the Court, sitting as a jury, must be for the defendants.
(*Rejected.*)

*Defendants' 4th Prayer.*—The defendants pray the Court to
rule as a matter of law that if the Court, sitting as a jury, find
from the evidence that at the time of the sale by the defend-
ants of the northeast corner of Baltimore and Hanover streets,
to the principal of Orem and Forsythe, who ultimately proved
to be Stokes, there existed no subsisting agreement on the
part of the defendants to divide any commissions with the
plaintiff, or with Riordan acting for the plaintiff, on a sale of
the said corner property, and if the Court, sitting as a jury,
further find from the evidence that neither the plaintiff, nor
Riordan acting for the plaintiff, was the procuring cause of the
said sale, that in this event the plaintiff is not entitled to re-
cover, and the verdict of the Court, sitting as a jury, must be
for the defendants. (*Granted.*)

*Defendants' 5th Prayer.*—The defendants pray the Court to
rule as a matter of law that even if the Court, sitting as a jury,
find from the evidence that the defendants, or either of them,
at or before the purchase by them of the strip at the northeast
corner of Baltimore and Hanover streets, agreed with the
plaintiff, or with Riordan acting. (known or unknown to the
defendants) for the plaintiff, that in case Stokes was located,
through either the defendants or the plaintiff on the northeast
corner of Baltimore and Hanover streets, that then the plain—

tiff and the defendants would divide commissions, still if the Court, sitting as a jury further find from the evidence in this cause that Stokes upon being informed of the purchase by the defendants of the said corner lot, gave up the idea of acquiring said corner, and discontinued negotiations therefor, and that Riordan notified the defendant Frick of this fact; and that the sale subsequently made by the defendants to Stokes of the strip at the said northeast corner, was the result of new negotiations thereafter opened with the defendants by Orem and Forsythe, acting for a principal then unknown to the defendants, which principal subsequently proved to be Stokes, who had taken up the matter of the said purchase anew upon the solicitation of Orem and Forsythe, so that the said sale to Stokes was made entirely through the instrumentality of Orem and Forsythe, and was in no way referable to either the plaintiff or Riordan; that then the plaintiff is not entitled to recover, and the verdict of the Court, sitting as a jury, must be for the defendants. (*Granted.*)

The cause was argued before BOYD, PEARCE, SCHMUCKER, BURKE and ROGERS, JJ.

*Walter I. Dawkins,* for the appellant.

*Albert C. Ritchie* (with whom was *Stuart S. Janney* on the brief), for the appellee.

PEARCE, J., delivered the opinion of the Court.

Both the appellant and the appellees at the time that the controversy in this case arose, were, and the appellees still are, real estate brokers in Baltimore City, and the suit was brought by the appellant to recover from the appellees half the commissions received by them from the sale by them to Sylvanus Stokes of a lot at the Northeast corner of Baltimore and Hanover streets.

The case was first tried in November 1905, and resulted in a verdict for the defendants under instructions from the Court

that the plaintiff could not recover, because at the time his alleged cause of action arose, he did not hold a real estate brokers license as required by the charter of Baltimore City. On appeal from that ruling the judgment was reversed and the case remanded for a trial on the merits. 103 Md. 352. This trial was had in January, 1907, before JUDGE STOCKBRIDGE without the intervention of a jury, and a verdict was again rendered for the defendants, this appeal being taken from rulings both upon the admissibility of evidence and upon the prayers offered.

The testimony is voluminous, and there is much conflict upon one of the material questions in the case as to the alleged agreement between the parties, but the law applicable to the controverted facts, we think is settled by the decisions in this State. We shall request the Reporter to set out the prayers in full, and it will be sufficient for their proper consideration, to state the respective contentions of the parties, together with some of the salient features of the testimony, without attempting to go into all the details.

The appellant's contention is two fold: 1st. That there was an express agreement between himself and the appellees to divide with him the commissions received by the appellees in case Stokes bought through them the Northeast corner of Baltimore and Hanover streets, which he did in fact ultimately purchase through the appellees; and 2nd. that even if there was no such express agreement, that he nevertheless laid the foundation for the sale ultimately made to Stokes, was its *procuring* cause, and was therefore entitled under the custom shown to prevail between real estate brokers working together for a sale, to a division of the commissions.

The appellees' contention may also be said to be two fold; 1st. That the alleged agreement related exclusively and expressly to a specific piece of property known as the McClellans alley lot which they did not succeed in procuring for Stokes; and 2nd. That though Walker brought the appellees into communication with Stokes as a prospective purchaser of a hotel site in Baltimore, and although after the failure to sell

him the McClellans alley property Walker endeavored with the assistance of George G. Riordan to locate Stokes on the Northeast corner of Hanover street yet the appellees during that time were endeavoring to locate Hamburger & Sons on that corner for a commercial business, and had themselves taken an option upon the Northeast portion of that corner in order to enable them to control the situation whatever might be the ultimate result of the negotiations; but that the effort of Walker to locate Stokes failed entirely because of Stokes inability to finance the purchase of the whole property, and that though Stokes also desired to purchase the strip on which appellees had taken their option, believing it would be a safe transaction for him, even if he failed to secure the rest of the property, yet when he learned that the appellees had closed their option on the northeast strip, he abandonded altogether the purchase of that site, and so informed Riordan and Walker, who in turn informed the appellees; and that subseqnently a Mr. Orem introduced to the appellees a Mr. Forsythe who stated that he wished to purchase that corner for a hotel he intended to erect, and that after several interviews the appellees sold him the strip they had purchased at an advance of $500. entering at the same time into an agreement that the rest of this northeast corner should be bought by him through the appellees as brokers, all of which was carried out in good faith; and that the appellees believed that Forsythe was the real principal in the transaction, and did not know or suspect that Stokes had any connection with the transaction until their agreement with Forsythe was closed, and until he directed that their contract for the slip purchased by them should be assigned to Stokes; and that Stokes was only enabled to purchase the property, at the time and in the manner described by reason of Forsythe's ability, in conjunction with a Philadelphia builder Mr. Gilpin, to furnish the additional money necessary for carrying out the plan, and which Walker & Riordan had been unable to furnish.

We have examined the record carefully, and find ample evidence legally admissible and not excepted to, tending to

prove these respective contentions of the parties as to the facts. It is not disputed that Walker introduced Stokes to the appellees as a customer for a hotel site in Baltimore shortly after the great fire of February 7th, 1904, and that he ultimately purchased through the appellees the property on the northeast corner of Baltimore and Hanover streets on which the Hotel Caswell was erected for him. Walker testifies that upon being authorized by Stokes to look for a hotel site he examined a number, one of which bore a sign showing it was for sale by the appellees; that he called on Frick and told him he had a New York hotel man he thought they could land if he could get a good location, and said to him, "Now Mr. Frick we are both real estate men, and if we make the sale I expect a division in the commission whatever you and I will get out of it," and that Frick replied, "certainly Mr. Walker, that is thoroughly understood among real estate people that it should be so." That Walker then described the lot he had in mind, which Frick said was between McClellan's alley and Little Sharp street, and also said that it was in contemplation to extend Hanover street above Baltimore street, in which case there would be two new corners there. That Frick said part of the McClellan's alley property was owned or controlled by the Safe Deposit Company, and that Frick and Walker then called on Mr. Marshall of the Safe Deposit Company, and Frick said to him, "Mr. Walker and I are working to secure a hotel property;" that they did not get any definite price on the Safe Deposit lot, but that Walker submitted to Stokes the McClellan's alley property and also told him of the two new corners dependent upon the extension of Hanover street; that he and Frick worked on the McClellan's alley property for some time and nearly accomplished a deal, when the Safe Deposit Company sold or built on their part of that property, and that site was then abandoned; that afterwards he had frequent interviews with Frick in which they discussed for this hotel site different lots on Baltimore street including the two contemplated new corners and the old Carrollton site, and that these discussions continued until the latter part of August,

1904, when Stokes telegraphed his friend, Samanni, to secure the extreme northeast portion of the northeast corner of Hanover street, at $20,000, when he and Samanni called on Frick and showed him the telegram, and Frick said "there is nothing in Stokes; besides I have an option on this property for a commercial business. Mr. White is with me and I do not want anything to do with Stokes, because there is no business in it; "that Walker then replied, "suppose the commercial end does not go through on that corner, do I stand the same with you as last spring? Do I get half the commission?" That Frick said, "Yes, if Stokes buys that lot of course we stand together, but I think you are wasting your time, I have wasted enough of mine." Walker admitted on cross-examination that when he and Frick first met Stokes at the St. James' Hotel, the McClellan's alley property was the only one considered, but he testified also that Frick's agreement with him was, that if Stokes got any hotel site in Baltimore through Frick, he was to divide commissions with him, and that he did not disclose Stokes as his principal until Frick had made that agreement with him.

Mr. Frick on the other hand testified that the only agreement with Walker for a division of commissions was in case they sold the McClellan's alley property to Stokes or his associates and that there was no other specific property under consideration between himself and Walker and Stokes. He denied Walker's version of the interview at which Stokes' telegram authorizing the purchase of the northeast slip of the corner was shown him, and said that he told Walker, "You will have to count me out, I am working on that corner for Howard White for another matter, a commercial proposition;" that Walker replied, "Suppose that don't go through, and I could get Stokes there, how do we stand on that?" he answered, "Mr. Walker, you will have to let me out. I do not think Mr. Stokes means business, and I am out of it. Count me out." He testified that he knew Hamburger & Sons for whom he was working to get the northeast corner, that he knew they meant business, and he preferred to keep clear of

Stokes in the matter; that he and White took an option from Mr. Willis on the northeast strip of the northeast corner because they wished to control the situation in any event; that they felt confident Hamburger would take it off their hands, and even if they did not that it was a safe investment for them, and that with these views they closed their option with Mr. Willis on that strip on September 20th, and took that part of the property, and that when they finally made the deal with Forsythe they had no knowledge or suspicion that he represented Stokes or that Stokes had any interest in the transaction.

Samanni substantially corroborated Walker as to Frick's agreement to divide commissions, as did also Mr. Geo. J. Riordan, while Mr. White sustained Mr. Frick's version, and distinctly denied that given by Mr. Riordan.   Stokes testified that for some time the only property under his consideration was the McClellans alley property, and that after that fell through, Frick gave him a price on the northwest corner of Hanover St. which he considered, but finding that the northeast corner was a better shaped lot he preferred that; that when he sent the telegram of Sept. 20th to Samanni to purchase the strip of 19 feet, part of the northeast corner, his financial arrangements would not have enabled him to close for the whole property, but he was able and willing to take the 19 foot strip, in order to facilitate the whole transaction—believing that he could thereby control the whole property, and that if they did not, he would be safe in the purchase of the strip, He said he was somewhat sore when he found some one else had purchased that strip, and that he then dropped the whole matter, and when Riordan and Walker telephoned him and held out hopes of getting it still he told them he regarded the thing as ended and dismissed it from his mind.

Mr. Riordan also testified that Stokes informed him he refused to proceed any further with the negotiations for that property, and that he so informed Mr. Frick, and Frick testified to the same effect, and that Riordan told him to go ahead, and he replied "we have gone ahead and have bought the property."   Frick further testified that about a week after this,

Orem said he understood Frick and White had bought the northeast corner of Hanover St. and asked what they were going to do with it, and he replied "we bought it for a wholesale commercial proposition." Orem said "I have got a man who wants that for a hotel. Can we get it?" Frick said "I will see what can be done," and told Hamburger what Orem said. Hamburger said he would not stand in the way if anyone would put up a good hotel there, and that Frick could go ahead, but not to let the northwest corner get away as he wanted that if a hotel went up on the other corner; and that Frick then went on with Orem and Forsythe, and sold them the northeast corner, supposing that Forsythe was Orem's principal, and not knowing or suspecting Stokes to be in anyway interested until Orem directed their contract for the 19 foot strip to be assigned to Stokes.

Stokes testified that after abandoning his negotiations through Walker and Frick, he was induced by Forsythe to take up the matter again; that he, Stokes, found it would require about $100,000 more than he had expected or could control to go ahead with the plan and that Forsythe claimed that he and Gilpin could raise the additional amount, and that he then authorized him to carry out the plan he proposed if he could do so, and that he would not have taken up the matter again unless Forsythe had submitted his proposition or some one else had submitted one equally as desirable.

It would serve no useful purpose to detail more of this voluminous testimony. What we have recited will enable us to consider the propriety of the rulings appealed from.

Four exceptions were taken to rulings upon the admissibility of testimony. Stokes being on the stand, after stating when and how he abandoned the negotiations with Walker & Riordan, and when and how they were opened with Forsythe, was asked by Walker's counsel whether he had any conversations with Walker during that interval, and said he had freqently. He was then asked, "what did you generally discuss?" Objection being made, the objection was sustained, and the first exception was to this ruling. If this question had been al-

lowed as framed, the witness could have detailed in response, the private discussions between himself and Walker though out of the presence of the appellees or any of them. Having no knowledge of these discussions, they could not be bound by anything which either Walker or Stokes might say upon the subject in controversy, and the Court was clearly right in refusing to admit the evidence. *Walker* v. *Baldwin*, 103 Md. 352.

The second exception arose in this way. During the cross-examination of Stokes by the counsel of the appellees, he was required by the Court to make the witness his own, if he wished to proceed further upon his line of interrogatory, and he made the witness his own. The line of interrogatory referred to the testimony we have already mentioned tending to show that the sale ultimately made to Stokes was not brought about by any effort or influence of Walker but was solely the result of an entirely new negotiation begun and completed through Forsythe; without any knowledge of the appellees that Stokes had any interest in the matter. The appellant objected to that whole line of testimony, both in chief and on cross-examination, but the Court overruled the objection, and admitted the testimony. It is well settled that where negotiations for a sale through a broker are *bona fide* broken off and abandoned, and a sale finally effected wholly through the influence of another, the first broker is not entitled to his commissions. *Livezey* v. *Miller*, 61 Md. 336; *Hollyday* v. *Southern Agency*, 100 Md. 296. There was no error therefore in this ruling.

At a later stage of the case when Frick was testifying for defendants, objection was made to his stating the details of Forsythe's plan of financing the new deal and the objection was sustained correctly. At that time the Court said, referring to Stokes' testimony on that subject, "Of course on proper motion, the plaintiffs evidence will be excluded on same lines." It is not apparent how these details, though strictly immaterial, could have worked any injury to the plaintiff, but however that may be, no motion to exclude that part of plaintiffs testimony was made, and it cannot now be complained of.

On his direct examination Frick was asked what his agree-
ment was with reference to commissions, and he said it was to
divide commissions.    Appellees counsel then said "in case of
what?" and Frick answered, "in case we sold the property on
Baltimore street between McClellan's alley and Little Sharp
street to Sylvanus Stokes or his associates." Up to this point
there was no objection.    Appellees counsel then asked "Did
that agreement extend to any other property than the Mc-
Clellan's alley property?" which was objected to as leading,
and the objection was overruled, to which the 3rd exception
was taken.    Frick's reply was, "not that I know of."

In *Lee* v. *Tinges*, 7 Md. 234, the Court approved the defi-
nition of a leading question given by Mr. Greenleaf in vol. 1,
sec. 434, "where he describes it as embodying a material fact,
and admitting of an answer by a simple negative or affirma-
tive," and the Court said the question asked in that case did
present a material fact and might very well have been answered
by the witness by simply saying "I was, or was not," and
therefore held the exclusion of the question by the lower Court to
be correct.  So here, the question asked presented a material fact
and could have been answered "it did, or did not," and it is
quite clear that the witness could have no difficulty in knowing
what answer was expected.    Strictly tested by the above rule
the question would seem to be leading, but we cannot perceive how
Walker could be injured by the answer *actually* given, viz., "not
that I know of." Assuming the witness, as we must, to be truth-
ful, his previous answer was a practical denial that the agree-
ment extended to *any other property*, and standing alone would
necessarily be so regarded.    When he answered the next
question, "not that I know of," instead of saying, "it did not"
he weakened his previous answer, and upon the question of
fact involved, the plaintiff stood in a better position than be-
fore the last answer.    Moreover, a few moments later the
same witness was allowed to say, without objection, that *"the
only agreement* was when Walker brought up the McClellan's
alley property."    As there is in our view no concurrence of
error and injury we would not be justified in reversing, on this
exception.

The fourth exception was taken to the admissibility of all of Frick's testimony between pages 104 to 128 of the record, so far as it proves any conversations with White, Gilpin, Orem, Forsythe or others or as to any plan entered into by the witness and any one of the parties defendants, or those with whom they were operating out of the presence of the plaintiff, or of Stokes, but the Court overruled the objections.

What we have said in reference to the second exception will suffice to show that we think there was no error in this ruling and that its correctness is sustained by the decision in *Livezey* v. *Miller*, *supra*. This brings us to the rulings on the prayers.

We are of opinion the two contentions of the appellant were fully and fairly submitted to the Court sitting as a jury, with whose findings of the facts we are not concerned.

The plaintiff's first contention, based upon the agreement alleged by him, was fully and clearly presented by his ninth prayer which was granted. If the Court had found such an agreement from all the evidence in the case, the verdict would have been for the plaintiff. His second contention was covered by his third and fourth granted prayers, and the measure of recovery upon either contention was clearly and properly stated in his seventh granted prayer.

If the plaintiff's third prayer is subject to any criticism, it would seem to be that it is too liberal to him, and would tend to mislead a jury (if one had been sitting in the case) by not clearly discriminating between the mere result of the introduction of the purchaser, and the procuring cause of a sale.

The plaintiff's 1st, 2nd, 5th, 6th, 8th and 10th prayers were all properly rejected. All the cases agree that the disclosure of the purchaser's name and the putting of him in communication with the defendant, by the plaintiff must be not only the foundation upon which the negotiation was *begun*, but upon which it was *conducted* and the sale *ultimately made*. *Keener* v. *Harrod*, 2 Md. 71; *Hollyday* v. *Southern Agency*, 100 Md. 296. The broker must be shown to be the *procuring cause* of the sale. The intervention of the plaintiff in begin-

ning the negotiations, and their subsequent culmination in a sale will not suffice unless *those negotiations* were the ultimate cause of the sale. None of the plaintiffs rejected prayers conform to these requirements. Nor do any of them take into account the evidence to show abandonment by Stokes of negotia:ions through Walker, and the subsequent negotiations through Forsythe, without defendant's knowledge that Stokes was his principal.

There was no evidence of any *employment* of Walker by the appellees to sell this property, and the sixth prayer would have been misleading if granted.

There was no evidence of any agreement to compensate the plaintiff for services, a very different thing from divisions of commissions, and the eighth prayer of plaintiff was properly rejected.

The defendants' rejected prayers are not before the Court. Their fourth and fifth prayers only were granted, and these we think properly presented their two contentions upon the principles laid down in the authorities we have cited.

We think there was ample evidence to sustain the defendants fifth prayer and the special exception thereto was properly overruled.

Finding no error in any of the rulings of the learned Court below the judgment will be affirmed.

> *Judgment affirmed with costs to the appellees above and below.*