# WILLIAM C. TAFT ET AL.

## vs.

# HOWARD T. BAYNE.

*Broker's Commissions—Sale of Land.*

In an action to recover commissions on a sale of real estate, instituted by one to whom, with others, defendant had casually mentioned his willingness to pay commissions to any person who might effect a sale of his property, *held* that a verdict should have been directed for defendants by reason of lack of evidence that the sale was accomplished as a result of plaintiff's efforts or negotiations.

*Decided March 22nd, 1922.*

Appeal from the Circuit Court for Baltimore County (PRESTON, J.).

Action by Howard T. Bayne against William C. Taft and Phoebe A. Taft, his wife. From a judgment for plaintiff, defendants appeal. Reversed.

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, PATTISON, URNER, STOCKBRIDGE, ADKINS, and OFFUTT, JJ.

*Frank B. Ober,* with whom were *Lawrence E. Ensor* and *Janney, Stuart & Ober* on the brief, for the appellants.

*Wm. P. Cole, Jr.,* for the appellee.

BOYD, C. J., delivered the opinion of the Court.

This is an appeal from a judgment rendered in favor of the appellee against the appellants for commissions alleged to be due the former by the latter for procuring a purchaser

of a farm owned by Mrs. Taft, located in South Towson, Baltimore County.   There are sixteen bills of exception in the record, presenting rulings on evidence, and one embracing those on the prayers.

The plaintiff is not a real estate broker, but is a barber in Towson, in a shop owned by William M. Koerner.   In order to show the basis of plaintiff's claim, we will state the evidence fully reflecting on that.   The plaintiff testified that about the fifteenth of April, 1921, he cut Mr. Taft's hair in the barber shop, where he had a conversation with him. He was asked to tell what that conversation was, and replied: "Well we were talking about property for sale, and he said to me, 'Mr. Bayne,' he said, 'I have a property for sale down on the York Road at Rodgers' Forge.'   Of course I knew the property very well, I said, 'All right, Mr. Taft,' and he said, 'if you can sell that property I will give you commissions,' and I asked him, 'how much you want for it.'   And he said he would like to get thirty thousand dollars for it, and I said, 'how many acres,' and he said, 'fifteen, and buildings are in good condition and has nice fruit on it,' and I said, 'all right, Mr. Taft, if I can sell it for you I would be willing to do it. Of course that money looks pretty good to me,' and in about one day or so Mr. Held came in there and he said, 'I had a man over around Ruxton and places———' "

Objection was made by the defendants to the answer but the court permitted it to be given with the understanding that Mr. Held would follow it up.   The witness then proceeded: "He said that he had just had a man over through Ruxton looking at a place where he could put seven or eight telephones, and he said that he didn't find any place over there to suit this gentleman, and he said if he could get any place he was going to let him know and I said, 'Robert, I have a place on the York Road which would suit Mr. Clifford' and I said, 'If you can sell it, or get in connection with Mr. Clifford, I will give you part of my commission that Mr. Taft promised me,' and he said, 'all right, I will go out and call

up' and he goes out and calls up Mr. Charles Earp, and he came in and said he called up Mr. Earp, and Mr. Earp was to let Mr. Clifford know."

A motion to strike out the answer as hearsay and not responsive to the question was made, but overruled, and for some reason which is unexplained, that was repeated. The witness was then asked: "Did Mr. Held report to you any more the result of this talk with Mr. Earp?" which was objected to, but the witness was permitted to answer and said:

"He said he had been talking with Mr. Earp and that Mr. Earp said that he would let Mr. Clifford know in the morning, and in a couple of days afterwards Mr. Held came over there and said that Mr. Earp had called him and said Mr. Clifford would be out to see us on Wednesday to look at the property, and we waited for him Wednesday and he didn't come, and the next day or so afterwards Mr. Held came and told me Mr. Clifford had been to Mr. Taft's."

A motion to strike that out was overruled and the witness further testified: "That after Mr. Held reported to him that Mr. Clifford had been to the Taft property, he immediately got in the machine and went down to see Mr. Taft, and he asked him if Mr. Clifford had been out to see him and Mr. Taft said yes. Mrs. Taft was not present at that time; that Mr. Taft said, 'yes, Mr. Clifford has been here,' and witness said, 'I am the gentleman that notified Mr. Clifford about your place being for sale' and about that time Mrs. Taft came out on the porch and he turned around and said to Mrs. Taft, 'This is the gentleman that sent Mr. Clifford out to see us about the property,' and she didn't say anything at that time and turned around and went on the other end of the porch and we talked there for a couple of minutes and Taft said to witness, 'how did Mr. Clifford come to come out here with Mr. Steffey,' and witness said, 'I don't know anything about that.' "

He was asked "Who is that?" and replied, "The real estate man, Mr. Steffey, and he asked me, how did he get in touch

with him, and I said, 'Mr. Taft, I don't know about that,' and he said, 'Very well, I have signed all my rights over to the real estate broker,' he said, 'I have not anything to do with it,' he said, 'If you want your commission you will have to get it through Mr. Steffey.' "

The witness then went on to testify that he had not collected any commission on the sale, that the property had been sold to Mr. Clifford, that he didn't know the purchase price. He was then asked, "That day that you were at Mr. Taft's was anything said about the property being sold at that time?" and replied, "Well, he said he didn't know if Mr. Clifford was going to take it or not, but that morning I went down there Mr. Held told me Mr. Clifford would be out there on the following Saturday."

A motion to strike out that part of the answer of the witness as to what Mr. Held said was overruled.

The witness further testified on cross-examination that the time was in April, he thought on Friday, the 22nd, about a week following the time Mr. Taft was in the barber shop. That he did not see Mr. Taft any more after that, that he went there a couple of times after that but no one was at home; that the Friday he went there was the day before the Saturday that Mr. Held had reported that Mr. Clifford was going to return, that he told Mr. Taft he would be out on the following Saturday; that the sale had not been actually consummated when he was talking to Mr. Taft. He said he was not a licensed real estate broker; that he was a barber, that he had not seen Mr. Taft or communicated with him since April 22nd; that he did not send a bill to him for his commission because Mr. Taft said he did not see where he had any right to pay him, that he should get his compensation from the real estate agent, Steffey and Company; that he did not know Mr. Clifford, the purchaser, never saw him until the day he testified; that he did not claim to have taken any part in negotiating for the sale for it with Mr. Clifford, didn't carry on any of the negotiations between Taft and Clifford himself; that he used his friend, Mr. Held, that he was acting as his agent;

that Mr. Held knew Mr. Clifford, and he, Bayne, used him as his agent, that he didn't know what the property actually sold for eventually.

Harry T. Campbell testified that he was in the barber shop when the conversation between Mr. Bayne and Mr. Taft took place. He said: "I was sitting there waiting to be shaved, and I heard them talking about real estate and Mr. Taft said, 'Sell my place or find somebody to buy it, and there is $1,500 in it for you, and Mr. Bayne asked him how many acres and I didn't pay any attention,' but I heard him say he would give him $1,500 if he could find anybody to buy it."

William M. Koerner, the proprietor of the barber shop, said that Mr. Taft offered Bayne fifteen hundred dollars commission, and that a couple of months prior to that he offered him the same if he sold the place; that he did not remember whether Mr. Taft told Bayne the purchase price, but he had told him (Koerner) before that he wanted thirty thousand dollars for it, and Bayne was to get fifteen hundred dollars.

Robert I. Held said he knew Mr. Clifford when he saw him, had been introduced to him, met him at Ruxton, that he met him through Mr. Earp, who was chief clerk to the superintendent of maintenance for the Baltimore Suburban District of the C. and P. Telephone Company. The witness testified: "Mr. Earp called me up and said, 'Bob, I got a gentleman coming out there to buy a place and he wants to get a place where he can get seven or eight telephones,' and I said, 'All right,' and he said, 'Can you meet him at Towson,' and I said, 'Not now, I am at Ruxton.' He says, 'He has a place in view at Ruxton and he will meet you,' and I said, 'All right, meet me at the bridge,' and I don't know whether it was in the morning or in the afternoon, and he said, 'Wait there and he will be out there,' and I said, 'All right,' and I waited and Mr. Clifford and his wife came out and I met them at the store and took them around to see Mr. Allison's place at Melvern Avenue, and he looked at it and didn't like it, and asked if I knew of any other places, and I think somebody told him

about another place at Riderwood, and I said Sheriff Green's place is for sale."

He said that a day or two after that, it might have been the same day, he went in the barber shop to get shaved and they were talking about real estate and he asked "Baynie," as he called him, if he knew any place around Towson, "and he said what kind of a place?" and I said Mr. Clifford wants a small place of about ten or fiften acres, and he said he would not need thirty, and he said, "I know a place that will suit him."

That was objected to, but the court permitted the question and answer to go in. The witness then answered: "And 'Baynie' said Mr. Taft's place down the York Road. I said, 'All right, I will tell him.' That was dinner time. I don't know what date it was. That was dinner time. I went around to the office and I called Mr. Earp and told him and he said, all right, 'I will tell Mr. Clifford,' so that day some time Charlie Earp called me back."

He was asked: "That was the day following your conversation with Mr. Bayne?" and replied, "Yes, it might have been the same day; the same day, I am sure it was, that I called Charlie Earp and he called me back; I told him that I knew a place that I thought would suit Mr. Clifford and he said, 'Where is it?' and I said, 'South Towson, right across from Rodgers' shop,' and he said, 'Can you give him telephones there?' and I said, 'I don't know, I would have to look it up,' and I went back to the office and he called me up again and said, 'Did you look that vicinity up,' and I said, 'Yes, I think we can give it to him,' and he said, 'Tell me where it is,' and I said, 'It is at Rodgers' shop, directly across from Rodgers' shop,' and he said, 'All right, Mr. Clifford will come out.' "

Held said that he told the appellee that Mr. Clifford was coming out to look at the property; that he (Held) went down with the plaintiff to the Taft property, but he did not hear what was said. He was asked by counsel for the plaintiff, "Is that all the conversation you had with Mr. Earp?" and

replied: "Mr. Earp said Mr. Clifford had bought the property and go down to see what it will take to give him service."

On cross-examination he said that he was trouble man for the telephone company, that Mr. Earp was chief clerk to the superintendent of maintenance, that he still worked for the telephone company; that he first saw Mr. Clifford as a result of getting orders from the telephone company; that it was the telephone company's business that took him around with Mr. Clifford to see the places. That he was not interested at all in the commissions; that Mr. Bayne said if he sold this property he was going to get a machine." And afterwards stated that Bayne said he would give him two hundred dollars.

It was agreed that if Charles Earp was present he would testify as follows: "That on or about April 20, 1921, Robert W. Held, of Towson, called him by 'phone and staied that property of the defendants was for sale located at Rodgers' Forge, Towson, and had been mentioned to him (Held) by the plaintiff, that he then called and brought it to attention of J. Lawrence Clifford, who afterwards purchased the same; that he had no further negotiations with said Clifford or said sale: and that he makes no claim for commission on said sale, that he does not know what influence, if any, his part in the matter had on said Clifford."

The defendant, William C. Taft, was called by the plaintiff and testified that his wife was the owner of the property spoken of; that it was sold some time in May to J. Lawrence Clifford for twenty-six thousand five hundred dollars. The deed was to James Lawrence Clifford and Mary Ann Clifford, his wife, and dated June 3, 1921.

The plaintiff rested and William C. Taft was called on behalf of the defendants. He testified that he had only known the plaintiff as a barber in Koerner's barber shop; that he talked once with Koerner, the proprietor of the shop, because he had been employed by Mr. Turnbull, from whom they bought the place, and he was interested in it; later he recollected saying to him that he wanted to sell and had a

certain price put on the place and some commission for the man that sold it; that he had been trying to sell the property for three years. He was asked to tell about the conversation with Mr. Bayne, and replied: "Why, I had no specific conversation with Mr. Bayne. As I recall, I was out of the chair and paying my check and stood behind Koerner's chair and was talking to him, if anybody, much more than anybody in there, and there were several barbers and the bootblack, and he might just as well come in for a commission as any other man there, as I understand it; I had no specific conversation with that man in view of constituting him my agent."

He said that when Bayne came to his house he did not recognize him, as he was accustomed to see him in his barber's coat. Bayne introduced himself to him and said, "I am the man that sent Mr. Clifford to Steffey," and my wife was there, and I said, "this is the man, it appears, that has sent Clifford, our possible purchaser, to the real estate people," and I said to Mr. Bayne, "If that is true, then, as you say, I don't see why Steffey won't do the right thing by you in the way of commission, but it is a matter in which I had absolutely no interest."

He testified that Steffey and Company, real estate brokers, had the exclusive right at that time to sell, and that he had paid them the commission ($1,325), but he had not paid it when Mr. Bayne came to see him, and the sale was not then consummated; that he first met Mr. Clifford when Mr. Emmart, representing Steffey and Company, brought him to the place, but never met or heard of him before; that Mr. Bayne never told him to see him; that when Mr. Emmart brought him there he showed him over the place, and there was afterwards quite a long negotiation; that Mr. Emmart conducted the negotiations and Mr. Bayne had nothing whatever to do with them, and never sent him a bill for commissions before he brought the suit and never made any demand on him for commissions after the sale; that he had no idea of what

Bayne did, other than what he said; that he knew nothing whatever about Mr. Earp, and never heard of Mr. Held; that he thought the contract with Steffey and Company was made the latter part of March; he thought of trying to sell it himself, but did nothing and gave it back to Steffey and Company; that Steffey had it during the three-year period, as well as other brokers, and he then made an exclusive contract with Mr. Steffey.

James L. Clifford, the purchaser, testified that he required telephone service in his business and at his home; that he knew Mr. Earp personally and had spoken to him to know if he knew of any place, and he said he did not; that he had been in touch with probably nine or ten real estate brokers, but he always told them he wanted a place of eight or ten acres, was on their lists; that he took the matter up with the telephone company because he would not buy a place unless he was sure he would obtain good service; that he met Mr. Held at the bridge at Ruxton and Mr. Earp had told him he would meet him there; that he had probably a half dozen places in that neighborhood to see, and Mr. Held was to go along and determine whether any of those places would furnish a good telephone service, and he looked at three or four of them. He was asked, "Were they agents to see about the telephone service, or as brokers?" and replied: "absolutely, I didn't know Mr. Held except in the capacity of the telephone company. That is all I knew of him. Mr. Earp told me he would meet me there and give me any information along telephone lines that I might wish." He said he did not remember of hearing of Rodgers' Forge until Mr. Emmart spoke to him about it; that Mr. Earp called him one morning and stated that Mr. Held had told him that there was a place on the York road named "Path," as he understood it. He was asked, "Named what?" and replied, "Named Path. In fact, I made a notation on my desk at the time, and I said, What kind of place is it? And he said, 'It is a very nice place; it sits back off the road, and

consists of thirty acres,' and when he said that, I said, 'Why Mr. Earp, I would not consider it, and would not be interested in thirty acres, because I don't intend going into farming.' I didn't want that sized place. I wanted it for a residence, and Mr. Earp said, 'I thought I would call it to your attention, because I know they can give you good service there, and that the place would give satisfaction,' and I said, 'I could not consider a place of that size,' because I had not a thing of that size in mind. I told them I wanted a place eight or ten acres at the utmost."

He said he did not do anything in reference to that, it passed out of his mind, never gave it another thought and he looked at ten or twelve places after that; that he did not know the name of Taft until he met Mr. Emmart; that he never spoke to Mr. Earp except over the telephone, never met Mr. Bayne and he met Mr. Held in connection with the telephone service at Ruxton. He was asked to tell in his own way how he came to buy the Taft place, and said that Mr. Steffey told him he knew he was looking for a place of eight or ten acres and that he knew of a very nice place on the Joppa Road, and they made an appointment for his wife, Mr. Emmart and himself to go there the next morning, which they did. It did not suit him, and they looked at two or three other places of about eight or ten acres, and on their way back to the city Mr. Emmart said they had a very nice place on their books which he knew would not suit him, but he might have some one whom it would suit. On their way to town they stopped and looked at it and he introduced them to Mr. and Mrs. Taft, and they looked over the place but had no idea of buying it, and did not even ask the price. On their way back he asked what Mr. Taft asked for it, and Mr. Emmart said thirty thousand dollars, and he thought that was too much. After leaving Mr. Emmart they looked at eight or ten places and later Mr. Emmart said over the telephone "won't you consider this place?" He told him his wife did not like the location, for reasons he gave, but Mr.

Emmart said come out some time and look it over again. About two and a half weeks after the first time he was there, Mr. Emmart persuaded him to go and talk with Mr. Taft, and after viewing any number of places in that section, he decided, even if it was an increased acreage and higher price than he wanted to pay, it would probably be about the nicest place he could buy and after considerable negotiations they agreed upon a price and he purchased it,—he thought it was on May 6th. He said that neither Mr. Bayne, Mr. Held, nor Mr. Earp suggested to him even to look at the property, and it was due to Mr. Emmart that he finally bought it; that the communications with Mr. Earp absolutely did not have any effect in persuading him to buy the property.

Mrs. Clifford, who is one of the grantees in the deed, went with her husband and Mr. Emmart to the Taft place and she corroborated her husband in every material respect. Her testimony was in substance that after going with Mr. Emmart to several places on the Joppa Road, which did not meet with their approval, they started back to the city and Mr. Emmart said: "I want you to look at Mr. Taft's property. It is about thirty acres." And he said, "Not for you to buy, but I just want you to see it, because I think it is as pretty a piece of property that is in this part of town," and Mr. Clifford said he would not even consider it, and he said, "I am not urging you to buy it, but I want you to see it, because it is very pretty," and so Mr. Clifford said, "We may as well look at it, we have looked at everything else, and we went to see this property and we met Mr. and Mrs. Taft. We went through the property and part of the grounds, and nothing was said about buying it at all. We had it not in mind at all, and we left them and later on, I guess a few days or so, Mr. Emmart called up." As a result of that they got in touch and Mr. Emmart said, why not go up and see it again, and on Sunday afternoon they were out riding and her father and brother were with them and they went to the Taft place. Her father advised them to buy it, but she did not

like the neighborhood for reasons she gave, but Mr. Clifford and Mr. Emmart went out later and they purchased the property.

Mr. Emmart, who was employed by Steffey and Company, licensed brokers, said they had the Taft property for sale, he thought, a year; had the exclusive right from some time in March, but knew it was for sale for two years. He testified that Mr. Clifford called them on the 'phone in regard to an advertisement of property on the Joppa Road, a place of nine and a half acres and he urged them to go out and look at it. They went out and looked at that and several other properties and later took Mr. and Mrs. Clifford to the Taft property, and they did not want that size place, or to pay that much money for a place. It was some time before he could get them together, but finally sold it to them. He said he did not know Mr. Bayne or Mr. Earp.

It will be observed that when Mr. Held went with Mr. Clifford to Ruxton, they did not go to the Taft place, and no suggestion was made about going there. Mr. Clifford did not meet the plaintiff, and the only suggestion that he would go to the Taft place with the plaintiff or Mr. Held, was what Mr. Held said Mr. Earp told him he would do, and even if such testimony could properly be admitted, the fact is that he did not go with either of them and the evidence fails to show that either Bayne, Held, or Earp, suggested to him to go.

We have thus gone very fully into the testimony and have referred to the material evidence which could in any way reflect upon the foundation Bayne had for this claim. It would be difficult to find a case among the many in our reports, in which there was less of a real foundation for a claim for commissions for selling property than in this. So far as shown by the evidence the plaintiff did not make any efforts to sell the property, and if he was authorized to do so, the authority was given to him in a most casual way. He certainly had no reason to suppose that he had an exclusive right to sell, which

he undoubtedly did not have, and according to the testimony
of his employer, Mr. Taft had made the same kind of an
offer to him. It is not shown that Mr. Clifford and Mr. Taft
were ever brought together by anything he did or anything
that was done by Mr. Held or Mr. Earp. Mr. Clifford went
to the Tafts at the instance of Mr. Emmart, who represented
Steffey and Company, and it was only after considerable
persuasion that he was finally induced to buy, as he wanted
a smaller and less expensive place. Mr. Held, the telephone
man, who told the plaintiff about Clifford wanting a place,
did not take him to the Taft property when he was looking
at properties with reference to the telephone service, and no
one connected with the plaintiff is shown to have suggested
his going there, and the uncontradicted evidence of Mr. Clif-
ford on that subject shows that when Mr. Earp spoke over
the telephone about what Mr. Clifford understood to be the
"Path" place, mistaking the name, he told him, "Why, Mr.
Earp, I could not consider it and would not be interested in
thirty acres because I don't intend going into farming. I
didn't want that sized place * * * I told them I wanted a
place eight or ten acres at the utmost."

The law of such a case is thoroughly settled by our own
decisions. *Keener* v. *Harrod,* 2 Md. 63, is a leading case and
has been cited and quoted from over and over again. It is
there said "that the mere fact of the agent having introduced
the purchaser to the seller, or disclosed names by which they
came together, to treat, will not entitle him to compensation;
but if it appears that such introduction or disclosure was the
foundation on which the negotiation was begun and conducted,
and the sale made, the parties cannot afterwards, by agree-
ment between themselves, withdraw the matter from the
agent's hands, so as to deprive him of his commission." In
this case it cannot fairly be said or suggested that the defend-
ants were attempting to escape the payment of commissions
by withdrawing the property from the plaintiff. It was in the
hands of Steffey and Company before the time the plaintiff

claims that Mr. Taft authorized him to sell it, and it could not be claimed, and is not, that plaintiff had the exclusive right to sell.

In *Walker* v. *Baldwin and Frick,* 106 Md. 619, 634, it is said: "All the cases agree that the disclosure of the purchaser's name and the putting him in communication with the defendant by the plaintiff must be not only the foundation upon which the negotiation was *begun,* but upon which it was *conducted,* and the sale *ultimately made. Keener* v. *Harrod,* 2 Md. 71; *Hollyday* v. *Southern Agency,* 100 Md. 296. The broker must be shown to be the *procuring cause* of the sale. The intervention of the plaintiff in beginning the negotiations, and their subsequent culmination in a sale will not suffice unless *those negotiations* were the ultimate cause of the sale." It would require a great stretch of imagination to enable one to believe that what the plaintiff did himself, or what Held did for him, was "the ultimate cause" of this sale, even if anyone should believe from the evidence that either of them began the negotiation.

In *Marlien* v. *Baltimore City,* 109 Md. 260, the Court, after quoting what we have just quoted from *Walker* v. *Baldwin and Frick,* said: "In other words, to entitle a broker to recover commissions for the sale or purchase of property, he must not only show his efforts or negotiations to accomplish the sale or purchase, but he must show that the sale or purchase *was accomplished as the result* of such efforts or negotiations."

In *Way* v. *Turner,* 127 Md. 327, what is quoted above from the two last mentioned cases, is repeated. In that case it was shown, with a view to establishing Mr. Turner as the procuring cause of the sale, that he had printed a small book listing sixty-five farms or pieces of land for sale, among which the farm of Mr. Way appeared as No. 18, and the cuts illustrating it were loaned to Mr. Turner by Mr. Way for that book. The book was sent to various persons, and one of them came to the hands of a nephew of Mr. Hazard, who became the purchaser of the Way property. Mr. Hazard was looking for a

farm in Talbot County and some of his friends wanted him to locate in the Trappe District. Mr. Hazard, his nephew, and another went to Easton and looked at several farms in that district, none of which suited Mr. Hazard. While on that visit, the book of Mr. Turner was examined and consulted, and Mr. Mullikin, a friend of Mr. Hazard, called Mr. Turner by telephone for the purpose of making inquiry as to farms marked one and two, in Mr. Turner's book, and was informed that they had been sold. Mr. Turner then called the attention of Mr. Mullikin to the Way place, and the attention of Mr. Hazard was thereby sought to be directed to it. That place, however, was on Miles River, and not in the Trappe District, and in the record it is uncertain as to the extent to which Mr. Hazard may have been brought to consider the Way property through the telephone conversation with Mr. Mullikin. Mr. Hazard positively denied that he was in any way influenced towards its consideration by that. There was, however, evidence given, by a witness named Stevens, that Mr. Hazard talked to him with a view to his taking him to see the Way property, which fact was communicated by Stevens to Turner, but he did not actually take him there. Subsequently, at just what interval of time is not clear, Mr. Hazard was taken there by another man and he liked the property and ultimately became the purchaser. Mr. Way had placed for sale in the hands of Mr. Turner, who was a real estate broker in Easton, the farm and certain of the stock and equipments on the place. The sale price was twenty-two thousand dollars, upon which Mr. Way agreed to pay a commission of five per cent., but he also placed the sale of the farm with a number of other real estate brokers and made independent efforts himself—having had the cuts made for a circular which had been prepared, which were loaned to Mr. Turner. This Court concluded its opinion by saying, "It is clear from the uncontradicted testimony that even if he (Turner) were the primary means by which the attention of Mr. Hazard was called to the Way property, he was in no sense the proximate or procuring cause

of the sale, and therefore, it was error not to have granted the first prayer of the defendant and withdrawn the case from the consideration of the jury."

Many of the facts in that case were similar to the material and important ones in this, but there were some circumstances much stronger for the plaintiff than those in this. Mr. Turner was a real estate broker, had spent money in advertising that with other places; his book was circulated, got into the hands of the nephew of the purchaser, and he called the attention of Mr. Mullikin, who was inquiring for Mr. Hazard about some properties, to the Way farm. It would be difficult to hold that the defendant's first prayer in this case should not be granted without overruling or conflicting with what is said in that case, as the prayers were the same.

In *Balto. Car Wheel Co.* v. *Clark*, 131 Md. 513, JUDGE BURKE said that under the facts and circumstances of the *Clark Case* the proximate or procuring cause was for the consideration of the jury, as it usually was where there was conflict, but he also said, "In *Turner* v. *Way*, 127 Md. 327, relied upon by the appellant, this court did decide as matter of law that the services of Mr. Turner were not the procuring cause of the sale therein under consideration, but in that case Mr. Hazard, the purchaser of the property, positively testified that he was not influenced in the purchase by the communication mentioned in the testimony." In this case Mr. Clifford was equally positive, and the evidence of his wife and Mr. Emmart in explaining what occurred corroborated him in the important particulars, and there was nothing to contradict him. In the *Martien Case* the court also approved of the action of the lower court in taking the case from the jury—the court saying: "As the plaintiffs in this case failed to show that the property was acquired by the city as a result of their efforts and negotiations, there was no error in the instruction of the court to the effect that under the pleadings and evidence the plaintiffs were not en-

titled to recover commissions on the amount paid for the Willis lot."

We are of opinion, therefore, that the first prayer of the defendant should have been granted. The second perhaps might also have been, but it was not necessary to refer to the pleadings, and as that might involve a discussion of the question of variance referred to in sec. 9A. of art. 5 (Code, vol. 4) we will simply hold that the first prayer should have been granted, as that required us to consider the evidence in the case, which we have done at length. That makes it unnecessary to discuss the rulings on the evidence, or as to the other prayers, as even if we assume that there was no error in admitting any of the testimony objected to which was brought before us by the numerous bills of exceptions, we are convinced that the plaintiff has not established a right to recover, and without further referring to the other prayers, the first should have been granted. It follows that the judgment must be reversed, and as there can be no recovery, a new trial will not be awarded.

> *Judgment reversed, without awarding a new trial, the appellee to pay the costs, above and below.*