T. DAVIS HILL et al. *vs.* FRANCIS N. IGLEHART ET AL.

*Real Estate Broker—Procuring Cause of Sale—Evidence— Revocation of Agency—Effect.*

To entitle a real estate broker to commissions for the sale of property, it must appear, first, that he was employed by the vendor to sell the property or, if he acted without precedent authority, that the vendor ratified his acts, and, second, that his acts were the procuring cause of the sale.					p. 547

Whether the acts of the broker were the procuring cause of the sale is ordinarily a question for the jury, and before the court will take the case from the jury, it must be satisfied that the evidence is so slight and inconclusive that no rational mind could infer from it the fact sought to be established.          p. 547

In an action by brokers for commissions, it appearing that the sale was made by defendants to one who knew nothing of the property until he inspected it in company with his father, then regarded as a possible purchaser, on a visit arranged by plaintiffs for the father, with the understanding that the latter would be accompanied by members of his family, and that the purchaser did not again see the property before the purchase, and had no information in regard thereto except what he saw on that visit and what he obtained from the father, as having been told the latter by plaintiffs, *held* that there was evidence that plaintiffs were the procuring cause of the sale.          p. 548

The principal, at any time before the broker finds a purchaser ready, able, and willing to buy the property on terms satisfactory to the principal, may revoke the agency, and if such revocation is untainted by fraud or bad faith, the broker will not be entitled to commissions, even though the principal after the revocation sells the property to a purchaser with whom the broker had been negotiating, and notwithstanding that the broker's efforts may have been the direct and procuring cause of the sale.          p. 550

If the owners of property, when revoking an agency given to brokers to sell the property, assent to an exception to the revocation, suggested by the brokers, as regards a sale to any one of certain possible purchasers named, they cannot thereafter question the right of the brokers to impose such a condition upon the revocation.          p. 553

An exception, in a revocation of authority given brokers to sell property, of a possible sale to "Mr. L. of the firm of that name," who was then recognized as a possible purchaser, *held* not to apply to a sale to his son, who was not then recognized as a possible purchaser, who bought the property with his own money, and took title in his own name, and in whose purchase the father had no interest of any kind.          p. 553

*Decided April 10th, 1924.*

Appeal from the Superior Court of Baltimore City (DAW-KINS, J.).

Action by Francis N. Iglehart and others, trading as F. N. Iglehart & Company, against T. Davis Hill and Laura S. Hill, his wife. From a judgment for plaintiffs, defendants appeal. Reversed.

The cause was argued before THOMAS, PATTISON, URNER, ADKINS, OFFUTT, and DIGGES, JJ.

*Edgar Allan Poe,* with whom were *Bartlett, Poe & Claggett* on the brief, for the appellants.

*Frank B. Ober,* with whom were *Janney, Ober, Slingluff & Williams* on the brief, for the appellees.

OFFUTT, J., delivered the opinion of the Court.

Some time during the spring of 1921, T. Davis Hill, one of the appellants, placed a farm property which he and his wife owned, containing about one hundred acres of ground, located near Owings Mills in Baltimore County, in the hands of F. N. Iglehart & Company, real estate brokers, having offices in Baltimore City, for sale, and agreed to pay five per cent. commissions on any sale that might be made by that firm. The firm of F. N. Iglehart & Company was then composed of Messrs. Iglehart, William M. Passapae, Arthur J. Emory, William E. Harris, Joseph F. Blake and W. G. D. Morrison. After they had been employed, the property was inspected by several members of the firm, and various efforts made to interest purchasers in it, but prior to September, 1922, with no apparent results. Among the persons approached by some member of the firm in their efforts to sell the property was Mr. E. A. Lycett, of the firm of that name on Charles Street in Baltimore City. As a result of their negotiations with him, Mr. Lycett and his son Isaac Cate Lycett visited and inspected the property in July, 1922. The appellees appear at that time to have assumed that it

was E. A. Lycett who would possibly buy the property, and did not apparently consider Isaac Oate Lycett at all, except as a son of Mr. E. A. Lycett, who was, because of that relationship, interested in the property. In connection with this visit and with their efforts to sell him the property, the appellees gave to Mr. E. A. Lycett all the information they had concerning it, and he in turn imparted that information to his son.

Nothing came of these efforts immediately and, shortly after that visit, E. A. Lycett bought a place in Guilford, through the appellees, and his son went on a vacation, and so far as the Lycetts were concerned the matter rested until September.

In the meantime the appellants had decided to change their brokers, and had attempted to terminate their relations with the appellees, and the position of the two parties, relative to their respective rights and mutual obligations growing out of the contract which the appellants proposed to cancel, as affected by this attempt, appears in part from the following correspondence:

On July 9th, 1922, Mr. Iglehart wrote Mr. Hill:

"I am simply writing to say to you that we have been following up very closely Mr. E. A. Lycett, and he stated to us very frankly, in our conversation with him today, that he was very much interested in your property, and what he is trying to do now is to induce his brother-in-law to come down from Howard County and farm the property, as 100 acres is really more land than he wants for himself.

"He stated to us that there was no place that he had seen that suited him better, and we think that very shortly we will get a proposition from him in regard to the purchase of the place.

"You can rest assured that we will keep right after the matter and push Mr. Lycett as much as we possibly can."

A month later, on August 9th, 1922, Mr. Hill wrote Iglehart & Company a letter in which he said:

"Having been most anxious that you should have
been able to find a customer for my place, because,
first, I wanted to sell it, and, second, would like to
have seen you make the commission, but although now
over a year has passed, it does not seem possible to
get any offer.

"As the time for showing this place to good advan-
tage this year is rapidly passing, I have reluctantly
decided to try another plan, which will necessitate
my withdrawing my place from you after this week.
This will enable you to follow any prospective cus-
tomers up which you have, and if you will send me a
bill for advertising, will remit.

"Regretting very much the apparent necessity for
this,"

To that letter, on August 10th, Mr. Iglehart made this
reply:

"I am in receipt of your favor of August 9th, and
note that you say that you will be obliged to change
the present arrangements with us as to the disposing
of your country place.

"Naturally, I regret that this has to be done, but
we will be guided by your wishes. I will have our
advertising department forward you a bill for adver-
tising as you requested.

"Kindly note that at the present time we have three
prospective customers who seem very much interested
in your place, and I will list the names with you, as
in the event of a sale to any one of these parties we
would naturally expect our commission if a deal was
consummated: Mr. Stanley Brager, Mr. Segal, Mr.
William Winchester. Of these prospective customers,
Mr. Stanley Brager seems the most interested.

"I may say that our Mr. Morrison is away on his
vacation, and I am unable to get in touch with him
until next week. *I am under the impression that he
has one or two parties interested in the place,* and on
his return I will get him to write you giving you the
names if such should happen to be the case.

"Regretting very much that we were unable to dispose of the place for you, but I must say that you gave us every assistance possible during the time we had the property exclusively for you."

On August 17th, 1922, Mr. Morrison of the same firm again wrote Mr. Hill in reference to the same matter and said:

"A further list of clients whom we have somewhat interested in your place I am submitting herewith. They are Mr. Jones, who was with the Smith, Lockhart Company; Mr. E. G. Tower, and Mr. Lycett, of the firm of that name.

"It is impossible to say at present just how soon we will be able to hear anything definite from either of these men, but will inform you immediately should there be anything of consequence.

"We regret that we have not been able to find a purchaser up to the present time, and hope that we may yet consummate the sale for you."

On August 21st, Mr. Hill wrote Mr. Iglehart a letter in which he said:

"Referring to your two letters, listing names of five persons to whom you have shown my place, as you have been unable to effect sales with these parties, I am writing to ask if at some time in the future someone else should be fortunate enough to sell to any one of them, if you would be willing to divide the commission with such a broker. * * * Am writing this, as I am considering giving exclusive privilege to sell."

And to that inquiry the appellees made this reply:

"Replying to your letter of August 21st relative to the division of commission with another broker in the event of sale of your place to any of the five clients listed with you in previous letters, beg to say that, as we are still working hard with these people in an endeavor to consummate a sale, we would not consider such division."

Shortly after the last mentioned letter was sent Isaac Cate Lycett returned from his holiday and found that his father had bought the Guilford property. During his absence, however, he had frequently thought of the Hill property, and had about made up his mind to buy it. So when his father told him that he had bought the Guilford property, he, Isaac Cate Lycett, announced his intention of buying the Hill property, which the appellants had then placed in the hands of Walter C. Pinkard, a real estate broker, with whom negotiations for its purchase were at once opened. As a result of these negotiations the property was, in September, 1922, sold to Isaac Cate Lycett for $41,500. These negotiations were conducted on behalf of the purchaser by both E. A. Lycett, the father, and Isaac Cate Lycett, the son, the father apparently acting as his son's agent in the part he took in them.

Mr. Isaac Cate Lycett's determination to purchase the property appears to have been based exclusively upon impressions formed on the occasion of his visit to it in July, and from information communicated to him by his father, which had been obtained from Iglehart & Company, the brokers who then had the property for sale, although that visit was arranged by the appellees, not for the purpose of interesting him in the property, for they did not then know that he was a possible purchaser, but for the purpose of interesting E. A. Lycett, his father, in it, and his presence on that occasion was more or less incidental and casual. But except for that visit, and for the information given him by his father, he knew nothing about the property which he later determined to buy, and in reaching that conclusion he does not appear to have been influenced at all by Mr. Pinkard, the broker who had it in charge when the sale was actually consummated, and to whom the appellants paid commissions for effecting the sale, as is apparent from this evidence:

Isaac Cate Lycett gave the following testimony in reference to that visit, and to his purchase: "One of these was the Hill place?" "It was." "Then you went out there. Well, then, you inspected the property that day, did you not?" "I

looked over it casually." "Well, did you ever inspect it again before you bought?" "I did not." "So that was—so you were buying something you knew about then, were you?" "Only as I had seen it at that time, and only as my father had described it to me." * * * "Well, now, then, you went away on your holiday. When you came back, why you spoke to your father about this North Charles Street property that he had bought, is that right?" "I spoke to him about it, yes." "And then what did you tell him about the Hill property?" "I do not recall the conversation exactly, happening over a year ago, but while I was away I had thought of the Hill property, and that if there was no objections in the family, I would proceed to get it." "Now, you wanted of course the family to all go with you and live there if you bought it, did you not?" "That was my intention at the time."

Walter C. Pinkard, the broker, referring to his part in the sale to the younger Lycett, said in part: "Mr. Lycett was going around to all the brokers trying to find a home, and I had shown him several properties, mostly around Ruxton, and it was on one of my visits to see him and see if I could not interest him in a property that he had told me he had bought this property on Charles Street through Iglehart's office, and I said, 'Well, I am sorry I lost making a sale,' or something to that effect, and we started back; and I said, 'Well, I guess you have seen some nice places,' and he mentioned the fact that he had seen the Davis Hill place. I said, 'Well, I have that for sale now.' Q. You have that for sale now? A. And it come up in that way. Q. Now, then, the next you heard, or when—a little while after that in September did you hear from Mr. E. Allen Lycett? A. Yes. Q. What did you do after that? A. He called me up and asked me to come up and see him, and I called at his store, and——(The Court): Who called you? (The Witness): Mr. E. Allen Lycett, the father, and I went up there, and he said—at that I cannot be sure. I knew it was a relative. He told me first a friend or relative, I cannot say which he said, of his was interested in the purchase of the T. Davis Hill property. I said, "All right, I will be very glad to sell it to him.'

I said, 'You are not interested in it yourself?' He said he was not. * * * Well, when was it you first knew that it was the son, Isaac Cate Lycett? A. Why, after the first few visits to the store, I will say along about—negotiations were going on for probably a week, and about the—after it had been on two or three or four days, he introduced me to his son. Now, I cannot say what visit. Q. Introduced you to his son? A. Introduced me to his son, and told me he was the purchaser, and explained that his son was buying it with his own money and where he got his money and all." Further testifying on cross-examination, the same witness said: "Q. Now, you, on your own instance, did not go see Mr. Lycett about the property, but they called you up? A. That is right. Q. And you came then around, and you found that they were ready to buy it, or someone, if the price was right then and there, were they not? A. I found that they were willing to buy the property provided they could get it at the price that they felt they wanted to pay for it. Q. When did you let Mr. Hill know who it was that was going to buy the property? A. As soon as I knew."

Mr. E. A. Lycett, in part said: "Now, was the first instance, the first time—when did you first learn of the property that was subsequently bought? Was it Mr. Iglehart told you, or one of the other members?" "Mr. Iglehart—at least, I do not remember which one of them, one of them told me, anyhow. I think it was Mr.—it was either Mr. Morrison or Mr. Harris. I do not know which." "I see. One of them?" "It was one of them that told me." "You had not had this property in mind, or did not know of it being for sale until that time, did you?" "I think not." "And then one of them asked you to go out and visit it?" "Yes." * * * "He kept on trying to persuade you, did he?" "He did." "Persuaded you to go see it?" "Yes." "And finally you did go out to see it?" "Yes." "And your son went with you?" "Not the first time, I do not think he did. He went the second time." "Who went the first time with you?" "I think my daughter and son-in-law were with me the first time." "And then you

went again, and you took your son with you that time, did you?" "Then I went again and took my son with me." "And you and he inspected the property?" "Well, he just— yes, he went with me, along with me. I was the one inspecting the property. The whole family were interested in it, of course." "You wanted to get a place that would please the rest of the family, didn't you?" "Yes." "You wanted him to see it anyhow, whether you were going to buy it or he was going to buy it?" "Yes." "Then he was looking at the property?" "He did look at the property." "And he went there and examined it?" "Yes, sir, he looked over it with me."

The history of the transaction as thus stated by these witnesses is substantially corroborated by the testimony given by the witnesses for the appellee, and for the purposes of this opinion will be assumed to be accurate. Indeed the only point on which there is any material conflict at all in the testimony is as to whether Iglehart and Company, when they were employed by Mr. Hill, were given the exclusive right to sell the property, and as to that the testimony for the plaintiff was to the effect that the agency was exclusive, while that of the defendant was to the contrary.

Upon these facts, when the property had been sold to Isaac Cate Lycett, the appellees demanded that Mr. and Mrs. Hill pay them a commission of five per cent. of the selling price. This the appellants refused to do, whereupon the appellees sued them in an action of assumpsit on the common counts in the Superior Court of Baltimore City. The case thus instituted came on in due course to be tried and, at the conclusion of the testimony given at the trial, the plaintiff offered three prayers and the defendant six. The plaintiff's first prayer, and the defendants' first, third and fifth prayers, were refused and all the other prayers granted, and those rulings are the subject of the only exception contained in the record. The verdict and judgment being in favor of the plaintiffs, the defendants have taken this appeal.

The most important question presented by the appeal is raised by the refusal of the court to grant the defendants'

first prayer, which amounts to a demurrer to the evidence, and the decision of that question depends upon the meaning and effect to be given the facts stated above. We have treated these facts as established and have stated them in narrative form, because by the prayer under consideration the testimony found in the record tending to prove them is conceded to be true.

The defendant's contentions upon these facts, in respect to that prayer, are these: first, that the appellees were not the procuring cause of the sale, and second, that when the sale occurred the appellees were no longer the agents of the appellants and that when the agency was terminated, Isaac Cate Lycett was not, within the contemplation of the parties, a possible purchaser; and these contentions we will consider in their order.

The legal principles controlling the first proposition have been frequently announced by this Court, and from them this general rule may be deduced, that is, that to entitle a real estate broker to commissions for the sale of property, it must appear first, that he was either employed by the vendor to sell the property, or, if he acted without precedent authority, that the vendor ratified his unauthorized acts (*Bond* v. *Humbird*, 118 Md. 650), and second, that his acts were the procuring cause of the sale. Many cases supporting that rule may be found collected and analyzed in *Taft* v. *Bayne*, 140 Md. 683; *Hoen* v. *Kidd*, 101 Atl. 782, 130 Md. 696; and *Keener* v. *Harrod*, 2 Md. 63, and whether the acts of the broker were the procuring cause of the sale is ordinarily a question for the jury, and "before the court will take a case from the consideration of a jury, it must be satisfied that the evidence is so slight and inconclusive that no rational mind could infer from it the fact sought to be established. 9 *Corpus Juris*, 586; *Parker* v. *Power*, 127 Md. 598; *Bethlehem Steel Co.* v. *Dornberg*, 135 Md. 125; *Burke* v. *Baltimore*, 127 Md. 561; *Walker* v. *Baldwin*, 106 Md. 619." *Weighardt* v. *Wagner*, 140 Md. 190.

Applying this rule to the facts stated above, there was in our opinion legally sufficient evidence in the sase to warrant

the conclusion that the appellees were the procuring cause of the sale.

In fact it is uncontradicted that but for the acts of the appellees, the sale would not have been made at all. The purchaser knew nothing of the property until he went to inspect it with his father, on a visit planned and arranged by the appellees. And while that visit was arranged for the father, it was understood that he, the father, would be accompanied by his son as well as by other members of his family. As a result of that visit, arranged by the appellees, and of information obtained from his father and furnished by the appellees, Isaac Cate Lycett subsequently determined to buy the property. What he saw on that visit, and what he learned from the information thus received, were the only factors inducing that decision, for he never saw it again until he bought it, and he received no information as to it from any other source. It cannot well be said therefore that there was in the case no evidence legally sufficient to show that the appellees were the procuring cause of the sale, and that conclusion is, we think, sufficiently supported by authority.

The case of *Maloon* v. *Barrett,* 192 Mass. 552, 78 N. E. 560, grew out of facts which are thus stated in the syllabus: "Defendant placed certain real estate in the hands of plaintiff, a broker, for sale, directing him not to advertise the same. Plaintiff published an advertisement of the property in good faith, having forgotten his instructions, and a purchaser learning that the property was for sale by reason of the advertisement, went to defendant direct, as the result of the advertisement, and purchased the property." Upon those facts, in dealing with the question as to whether the plaintiff was the procuring cause of the sale involved in that case, the court said: "It is stated in the agreed facts that the customer 'went to the defendant solely as a result of said advertisement.' That would have been decisive in favor of the plaintiff had there been no direction not to advertise the property. *Gleason* v. *Nelson,* 162 Mass. 245, 38 N. E. 497; *Dowling* v. *Morrill,* 165 Mass, 491, 43 N. E. 295; *Pratt* v. *Burdon,* 168

Mass. 596, 47 N. E. 419; *French* v. *McKay,* 181 Mass. 485, 63 N. E. 1068."

In *Sussdorf* v. *Schmidt,* 55 N. Y. 319, the court, in deciding a similar question, said: "A person claiming a commission upon a sale of real estate must show an employment, and that the sale was made by means of his efforts or agency. An owner may employ several brokers for the sale of the same property, and is of course only liable for commissions to the one who effects the sale. And although he employs one or more brokers he may negotiate and sell the property himself without liability to any one for commissions. (49 N. Y. 563.) The undertaking of the broker is to make effort to procure a purchaser, but if he fails he is entitled to no pay unless there is a special contract. But if the purchaser is found by his efforts and through his instrumentality, he is entitled to compensation, although the owner negotiates the sale himself. (51 N. Y. 124.) Nor is it indispensable that the purchaser should be introduced to the owner by the broker nor that the broker should be personally acquainted with the purchaser; but in such cases it must affirmatively appear that the purchaser was induced to apply to the owner through the means employed by the broker."

In dealing with the same question the court in *Shober* v. *Dean,* 39 Mont. 255, said: "If Shober had sent one of his circulars, descriptive of the Dean ranch, to Payne or Cannon; or had posted signs or placards describing the property in a newspaper and Cannon or Payne had seen the advertisement; or had exhibited the property to either one of them; or if he had interviewed either, or furnished him information respecting the property; or had brought either Payne or Cannon to Dean for the purpose of having him inspect the property; or had given Dean the name of Payne or Cannon as a prospective purchaser, and, as a result of any one or more of these things, the sale had been made by Dean—it would be held to have been the direct result of Shober's efforts. *Derrickson* v. *Quimby,* 43 N. J. Law, 373; *Sussdorff* v. *Schmidt,* 55 N. Y. 319; *Bell* v. *Kaiser,* 50 Mo. 150; *Earp* v. *Cummins,* 54 Pa. 394, 93 Am. Dec. 718; *Beauchamp* v. *Higgins,* 20 Mo. App.

514; *Tyler* v. *Parr.* 52 Mo. 249; *Stinde* v. *Blesch,* 42 Mo.
App. 578; 23 *Am. & Eng. Ency. Law,* 910."

And to the same effect is *Derrickson* v. *Quimby,* 43 N. J.
L. 373, in which the following facts were involved: Quimby
employed Derrickson to procure a loan for him. Derrickson
had the application printed and circulated copies of it. One
of the copies came to the attention of Coudert Brothers of
New York. Their agent acting on the information thus re-
ceived negotiated the loan and received his commission there-
for. Thereupon Derrickson, claiming that the loan had been
effected through his instrumentality, also demanded commis-
sions, which Quimby refused to pay. Upon these facts the
court held that "the fact that Coudert Brothers, through their
agent, Boyd, directly negotiated the loan, could not deprive
the plaintiff of his commissions. *Shepherd ads. Heddin,* 5
Dutcher, 334."

Nor is the conclusion we have reached at all in conflict with
such cases as *Way* v. *Turner,* 127 Md. 328, and *Taft* v.
*Bayne, supra,* since in those cases a recovery was denied be-
cause it appeared that the efforts of the brokers claiming com-
missions were not the procuring cause of the sales involved in
those cases, while in this case the conclusion is inevitable that
the sale was made as a direct result of the efforts of the appel-
lees.

The second objection, that when the sale to the younger
Lycett was made, the appellees were no longer the agents of
the appellants and for that reason were not entitled to recover,
presents a more difficult question.

The general rule is that the principal may at any time,
before the broker finds a purchaser ready, able and willing
to buy the property upon terms satisfactory to the principal,
revoke the agency, 9 *C. J.* 563, and that where such revoca-
tion is untainted by fraud or bad faith, the broker will not
be entitled to commissions even though the principal after the
revocation sells the property to a purchaser with whom the
broker had been negotiating, and notwithstanding that the
brokers efforts may have been the direct and procuring cause

of such sale. *Howard* v. *Street,* 125 Md. 302; *Attrill* v. *Patterson,* 58 Md. 226; *Beale* v. *Creswell,* 3 Md. 201.

If the agency of the appellees was revoked at all, and for the moment we will assume that it was revoked, the revocation was complete on August 10th, 1922, when the appellees wrote the appellant, T. Davis Hill, that they would be guided by his wishes. At that time neither the appellants nor the appellees knew that Isaac Cate Lycett thought of buying the property, for he did not express any such intention until the following month, and until he did express it no one interested in the sale thought of him as a possible purchaser. So that no fraud or bad faith can be imputed to the appellants in connection with the revocation, in so far as it affected the right of the appellees to commissions for a sale to Isaac Cate Lycett, for neither they nor the appellees then knew that he thought of buying the property, and there is nothing in the record which positively discloses that he had formed an intention of purchasing it at that time. So that if the agency was, as we have assumed, revoked on August 10th, 1922, the facts referred to are directly within the decision in *Howard* v. *Street, supra,* and are controlled by it, because at the time the revocation was completed the appellees had not produced a purchaser who was then ready, able and willing to buy the property at a price satisfactory to the principal. The facts involved in the case of *Howard* v. *Street, supra,* were these: Mr. Howard on May 16th, 1911, agreed to pay Mr. Street a commission of five per cent. if he effected a sale of a farm owned by Mr. Howard. Mr. Street interested Mr. Frank A. Bonsal in the property and communicated his name to Mr. Howard. Up to March, 1912, however, he had not succeeded in selling the place to Mr. Bonsal and in that month Mr. Howard revoked the agency. Some time later in the same year Howard sold the farm to Bonsal, whereupon Street demanded a commission on the sale. In dealing with that contention we said in that case: "Under the facts in this case the appellant contends that the appellee cannot recover unless there is evidence of bad faith upon the part of the appellant in withdrawing the authority to sell from the appellee, and

argues there is no evidence of such lack of good faith to submit the case to the jury. The appellee argues that under the decisions of this State the question of good faith is not the test of the right of recovery, but that if the appellee was the procuring cause of the sale, that then he is entitled to recover, notwithstanding the agency had been revoked. This contention is based upon the decisions of this Court in *Keener* v. *Harrod*, 2 Md. 63; *Jones* v. *Adler*, 34 Md. 440; *Attrill* v. *Patterson*, 58 Md. 226, and *Blake* v. *Stump*, 73 Md. 160. * * * The construction sought to be put upon the language of these cases by the appellee, completely ignores the rule of law applicable to the right of a principal to revoke the authority of his agent. * * * It is plain, under the decisions, that the authority in this case was not one coupled with an interest, nor conferred for a valuable consideration. If then the principal has the right to revoke the agency, the correct interpretation of the above cited cases establishes no more than that where facts show a sale made by the principal to have been the result of the agent's efforts, the agent cannot be deprived of the commissions agreed upon if it is established that the purpose of the principal was to avoid the payment of the commissions by withdrawing the authority before the sale was actually consummated. In other words, in such an agency as here, the principal had the absolute right to withdraw the authority before the sale was made, and if afterwards he availed himself of the efforts of the agent and made the sale to the agent's customer he is not liable to the agent for commissions unless his withdrawal was made in bad faith towards the agent. *Rees* v. *Pellow*, 97 Fed. Rep. 167; *Cadigan* v. *Crabtree*, 186 Mass. 7; *Smith* v. *Kimball*, 193 Mass. 582."

The question with which we are dealing is therefore narrowed to this; was there a revocation of the appellees' agency; and if there was, did the appellants except from its operation a sale to Isaac Cate Lycett. That there was a revocation is clear. Mr. Hill in his letter of August 9th informed the appellee that the property would be withdrawn from them after that week. The appellees not only failed to object to that action but assented to it, except in so far as it applied

to any sale made to any one of a number of individuals whose names they gave to the appellants, and to that exception the appellants have assented. So that after the revocation had been completed the position of the parties was this, the property was withdrawn from the control of the appellees but in the event of a sale of it to any one of the persons named they asserted a right to demand commissions on such sale. Whether they had the right to annex such a condition to the revocation under the circumstances of this case is under the authorities cited not clear, but since the appellants assented to it, that question becomes immaterial.

The remaining question is whether the sale to Isaac Cate Lycett was within the exception. The appellees in their letters of August 10th and August 16th, 1922, asserted a right to commissions if the property were sold to "Mr. Lycett of the firm of that name." By that expression they could only have referred to a single individual, for the language admits no other meaning. For reasons already stated they could not have intended to refer to Isaac Cate Lycett, for it had not then occurred to them that he might be a possible purchaser, and they could, therefore, have only referred to E. Allan Lycett, with whom they had been negotiating. Their contention, however, apparently is that a sale to Isaac Cate Lycett was within the scope of the language excepting a sale to E. Allen Lycett from the revocation, because it was in substance the same thing. But we cannot accept that view. The son was of age, he bought the property with his own money, and he took the title in his own name, and so far as the record discloses the father has no interest of any kind in it, and we are not able to see how under such circumstances a sale to the son can be regarded as equivalent to a sale to the father.

Since, therefore, what may be called the general agency of the appellees was revoked, and since the sale to Isaac Cate Lycett was not within the exception to the revocation, and since it does not appear that the appellees ever had any right to sell the property not derived from the original contract of employment or reserved to them in the exception to

·the· revocation, we have reluctantly reached the conclusion
that they were not entitled to recover in this case, and the
first prayer of the defendants should have been granted, for
while, as we have already said, it cannot be doubted on the
evidence in this case that they were the actual procuring
cause of the sale, it was made after their agency to sell it had
been terminated in good faith.

In view of the conclusion we have reached it becomes un·
necessary to refer to the remaining prayers.

> *Judgment reversed without a new trial, with
> costs to the appellants.*