# HOWARD S. KROH *v.* ALBERT ROSENBERG.

## [No. 10, October Term, 1929.]

274

*Decided January 8th, 1930.*

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*Francis E. Pegram,* with whom was *Francis E. Pegram, Jr.,* on the brief, for the appellant.

*William H. Surratt* and *Paul R. Hassencamp,* submitting on brief, for the appellee.

SLOAN, J., delivered the opinion of the Court.

There is one bill of exceptions in this appeal, and that is to the action of the trial court in granting the appellee's two prayers and refusing the appellant's first, second, third, and sixth prayers. The appellant's first prayer is a request for an instructed verdict for the defendant (appellant), on the alleged legal insufficiency of the evidence to support a verdict for the plaintiff, and therefore makes necessary a consideration of the facts.

The only conceded fact is that the appellant placed a property known as the Elizabethan Apartments, in Baltimore, in the hands of the appellee for sale. It is agreed that it was not an exclusive authority, and that the appellee would not be entitled to commissions on any sale made by the appellant unless the appellee should be the procuring cause of the sale. All other facts alleged by the appellee are flatly denied by the appellant and all his witnesses, so that, if the appellee (plaintiff) is entitled to recover, it is on the evidence produced by him.

It appears that some time in the year 1924 the appellant, Howard S. Kroh, had sold a piece of property through the appellee, Albert Rosenberg, as broker, and that shortly thereafter Mr. Kroh had verbally placed the Elizabethan Apartments in the hands of the same broker, with the understanding, if he produced a purchaser at a price satisfactory to the owner, that the commissions customarily allowed in Baltimore should be paid him. The appellee immediately listed the property with Charles N. Boulden and together they undertook to make a sale. The appellee testified that the first offer submitted by him to the appellant was from a Mr. Kahn, which was rejected; that he and Mr. Boulden attempted to sell the property to Abramson and Oliner, who made an offer of $60,000, and the appellee testified that he submitted this offer to Mr. Kroh, who rejected that also, because he wanted more money. "Had all dealings with Abramson and Oliner and conversations with all of them, Mr. Meyer Abramson, Mr. Abraham Oliner and Mr. Nathan Abramson and thought the last conversation took place in the

month of September, 1925, after receiving the letter taking property from his hands." Meyer Abramson made another offer for the property, proposing an exchange of properties, which also was submitted to the appellant and declined, with the statement that he wanted cash. The appellee further testified, "I went back and Mr. Nathan Abramson said: 'Let me try, perhaps I can get it across,' and after he went to see Mr. Kroh then I got this letter from Mr. Kroh withdrawing the property." The appellee did not take Abramson and Oliner to see the property as they said they were familiar with it and had seen it many times. "Q. Did Mr. Abramham Oliner tell you that? A. I don't know; they were all in the office, Mr. Abraham Oliner, Mr. Nathan Abramson, and Mr. Meyer Abramson. Q. When Mr. Abramson said, let him have a try, he would try to get it across, what did you understand? A. He was going to try to close the deal with Mr. Kroh." The appellant's price was $65,000, though the price accepted was $250 less. In the deal "there was another property taken in exchange which I (the appellee) had nothing to do with."

Mr. Boulden testified that he had approached Abramson and Oliner, and was told by them that "they were working with Mr. Rosenberg and they would take the property provided they could make some exchanges." Asked whether Nathan Abramson was present, he said he "was about the office more or less. He was in the office."

The sale was made to Nathan Abramson, son of Meyer Abramson, on an agreement between him and Mr. Kroh dated September 15th, 1925, whereby the latter and Frederick W. McComas agreed to convey the Elizabethan Apartments, at $64,750, subject to a mortgage of $35,000, which was reckoned in the purchase price, the purchaser, Abramson, conveying to Kroh No. 3825 Dalrymple Avenue, subject to a mortgage of $15,000, the purchaser making up the difference by a second mortgage on the "Sheffield Apartments" for $12,750, to be signed and guaranteed by Meyer Abramson.

This is substantially all the evidence which the appellee contends entitles him to the submission of his case to the

jury, and which the appellant contends "is so slight and in-conclusive that no rational mind could infer from it the fact sought to be established."

The appellant testified that, after putting his property in the hands of the appellee, the latter brought to him only one prospect, a dressmaker, who was unable to raise the money. He denied that the appellee ever even mentioned to him the names of Abramson and Oliner or Nathan Abramson, and he never had heard of a Mr. Kahn. Meyer Abramson testified that he had never discussed the Elizabethan Apartments with Rosenberg and did not know he had it for sale. He said he heard of the property through one Alexander Blumberg, who told him he had been trying to deal for it with Mr. Kroh and that, as a result of this information, he suggested to his son, Nathan Abramson, who had been trying to sell the Dalrymple Avenue property, which the son owned, that he try to make a deal with Mr. Kroh.

Nathan Abramson testified that his father's suggestion resulted in the agreement which has been mentioned. He denied any knowledge of Rosenberg or Boulden in connection with the property conveyed to him by the appellant.

This all goes to the weight of the evidence, and it is not within the province of this court to pass upon the merits of the respective contentions. *Lyon v. Townsend,* 124 Md. 163, 174; *Jones Hollow Ware Co. v. Hawkins,* 128 Md. 160, 167; *Kauffman Construction Co. v. Griffith,* 154 Md. 55, 61. "On the legal question presented by the record it is not our province to determine the credibility of the evidence of these witnesses on controverted questions of fact." *Grant v. Kot-wall,* 133 Md. 573, 575.

The appellant, on September 15th, 1925, the date of his agreement with Nathan Abramson, wrote the appellee as follows: "I am writing to ask you not to offer the Elizabethan Apartment House, Garrison and Bateman Aves., for sale. I desire to withdraw that property." In view of the appellant's contention that the appellee had not introduced the customer, had nothing to do with the sale, and was not its procuring cause, the letter was wholly unnecessary, unless it

was intended as notice to discontinue any further efforts to sell. The appellant does, however, contend that he had a right to withdraw the property from the hands of the appellee if done in good faith, and two of his granted prayers were based on this theory. For a thorough discussion of the circumstances under which a broker's authority may be revoked without liability to the principal, see the opinion of Judge Offutt in *Hill v. Iglehart,* 145 Md. 537. The letter does, however, establish one salient fact, viz., that the appellee had been authorized to sell the property of the appellant, and this, coupled with his testimony that he introduced the subject to both of the Abramsons and that thereby he became the procuring cause of the sale to Nathan Abramson, even though he did not personally introduce Nathan Abramson to the appellant, was for the jury. In *Sussdorf v. Schmidt,* 55 N. Y. 319, cited and quoted in *Hill v. Iglehart, supra,* it is said: "The undertaking of the broker is to make effort to procure a purchaser, but if he fails he is entitled to no pay unless there is a special contract. But if the purchaser is found by his efforts and through his instrumentality, he is entitled to compensation, although the owner negotiates the sale himself. (51 N. Y. 124.) Nor is it indispensable that the purchaser should be introduced to the owner by the broker nor that the broker should be personally acquainted with the purchaser; but in such cases it must affirmatively appear that the purchaser was induced to apply to the owner through means employed by the broker." We are, therefore, of the opinion that there is sufficient affirmative proof, that the appellee was employed to sell the appellant's property and that he was the procuring cause of the sale negotiated by the appellant with the purchaser, to take the case to the jury, and the defendant's first prayer was properly overruled.

The defendant's second prayer was an instruction to find for the defendant if they should find that the property "was sold by the defendant to a purchaser to whom it was never offered by the plaintiff." Under the evidence this prayer was properly rejected as having a tendency to mislead the jury. The appellee's testimony was that he was discussing the

matter with Abramson and Oliner when young Abramson, whom the appellee had not regarded as a purchaser, said, "Let me try; perhaps I can get it across." The appellee thought he was dealing for the firm, whereas he had his eye on the property for himself. If the appellee is to be believed, he did not offer the property to the purchaser, but to his firm, and if his story be true, he did introduce the matter of the sale to young Abramson, and was the procuring cause of the sale to him.

The defendant's third prayer stated that if the jury should find "from the evidence the property mentioned in these proceedings was placed by the defendant in the hands of the plaintiff for sale, if they shall so find; and if they shall further find that a sale was effected, the plaintiff is not entitled to recover unless the jury shall further find that the plaintiff has shown by a preponderance of evidence that he was the procuring cause of sale, if they shall so find, and their verdict must be for the defendant." This prayer states the facts essential to a recovery by the broker, namely, the authority to sell, a sale (or a purchaser, able, ready and willing to buy at the seller's price), and that he was the procuring cause of the sale (*Walker v. Baldwin and Frick,* 106 Md. 619, 634), and the burden is on him to establish these facts. 9 *C. J.* 634. But the last clause "and their verdict must be for the defendant" is clearly a *non sequitur,* calculated to mislead or confuse the jury, and vitiates the prayer.

The defendant's sixth prayer was properly refused. There was no evidence to support the statement that a sale was made subsequent to the revocation of the plaintiff's authority. The revocation was dated the same day as the agreement of sale, and there is nothing to show which was first in point of time. The revocation was mailed to the plaintiff, so that the probabilities are that he received it after the agreement was made. Nathan Abramson testified that his negotiations with the appellant began several days before the agreement was entered into, and of course the same number of days before the revocation was mailed.

The plaintiff's first prayer assumes as a fact authority to

the plaintiff to make an exchange of property with a purchaser, and, if it had been specially excepted to (Code, art. 5, sec. 10), the prayer would have been bad. The evidence is that the authority to the broker was to sell. The fact that the principal in his dealings with the customer made an exchange of property instead of exacting cash would not affect the right of the broker to his commissions. 9 *C. J.* 615.

The plaintiff's second prayer is the usual damage prayer in real estate brokerage cases in Baltimore City, and conforms to the decisions in *Blake v. Stump,* 73 Md. 160, 171; *Herbert v. Davis,* 139 Md. 526.

*Judgment affirmed, with costs to the appellee.*