## EDWARD M. STAYLOR *v.* MARIE J. STENGER.

[No. 26, October Term, 1930.]

*Decided December 5th, 1930.*

The cause was argued before Bond, C. J., Pattison, Urner, Offutt, Digges, Parke, and Sloan, JJ.

*Alva A. Lamkin,* for the appellant.

*Walter L. Clark* and *Roszel C. Thomsen,* for the appellee.

2

URNER, J., delivered the opinion of the Court.

The single exception in this record was taken by the plaintiff because the trial court directed a verdict for the defendant on the ground that the evidence was legally insufficient to support the claim involved in the suit. The basis of the claim is an agreement embodied in a letter dated December 29, 1927, from the defendant to the plaintiff, as follows:

"As per our conversation regarding my place at Dundalk, known as Miller's Park (plan submitted), I will take Two Hundred and Fifty Thousand Dollars ($250,000.00) cash for this place as it now stands.

"As to my other place at the foot of St. Helena, plan of said place enclosed, I will take Sixty Thousand Dollars ($60,000.00) cash for this place as it now stands.

"It is understood your commission on said sale will be Five (5) per cent. on the County property and Four (4) per cent. on the City property.

"This option only holds good until February 1, 1928."

The suit is concerned only with the defendant's Dundalk property, which is located in Baltimore County. It was acquired by the City of Baltimore for $222,500.00, as the result of an arbitration concluded on June 3rd, 1929, under an agreement between the city and the defendant executed on January 28th of that year. The commissions claimed by the plaintiff are calculated upon the price thus ascertained.

The origin of the plaintiff's employment to sell the property in question is thus stated in his testimony: "Mr. Marchant sent for me and said that he knew I was connected with the Maryland Swimming Club down there for a number of years. He told me that he represented the Burns and Russell tracts down there, and he was trying to have the City locate the airport down there for a concern in Cleveland. Mr. Glenn L. Martin was thinking about moving there and they thought that was the most desirable site. He said that he knew I had been connected with the Swimming Club for so many years that he thought I might be able to make a fee in the

matter. He asked me if I knew anybody else down there. I told him, Yes, I knew Mr. Miller." An interview with Mr. Miller, who is the defendant's father, and represented her property interests, was then arranged by the plaintiff, and the understanding reached in their conversation, at which the defendant was present, is set forth in the letter of December 29th, 1927, from which we have quoted. In accordance with its terms the plaintiff offered the defendant's Dundalk property to the City for $250,000, in a letter dated December 30th, 1927. The City refused the offer, but indicated its willingness to pay a much lower sum for the property. In consequence of the City's belief that an excessive price was being demanded, and of some newspaper criticism on the subject, the defendant's father, while insisting that her offer was fair and reasonable, proposed on her behalf that the price be determined by arbitration. It was not, however, until a year had elapsed that the agreement for such a method of adjustment was signed. The period of the option specified in the letter which stated the terms of the plaintiff's employment had then long since expired. Neither during nor subsequent to that period was there any agreement for its extension. Prior to the defendant's offer to arbitrate, which was made in her father's letter to the City on February 9, 1928, the plaintiff, as appears from his testimony, was asked by the defendant's father and brother, in her presence, whether he would reduce his commission to two or three per cent., if the arbitration proposal should be submitted and accepted, and he answered that he would treat them fairly if they were "put to that expense." The testimony does not mention the date of that conversation. It may have occurred before the expiration of the option under which the plaintiff was authorized to sell the property. But no action was taken at that time by the City upon the defendant's offer to arbitrate. About seven months later, the plaintiff received from the Real Estate Committee of the City a letter referring to the defendant's proposal of arbitration and stating that if the offer still continued, the City would be glad to arrange for such a proceeding "inasmuch as there is a vast difference

4

between your client's demanded price of $250,000.00 and our appraisal of $145,547.09." This letter is said by the plaintiff to have contained a blue print which he transmitted to the defendant's husband, who delivered it to her father, by whom it was returned to the plaintiff without comment. In an ensuing telephone conversation between the plaintiff and the defendant's father, Mr. Miller, who chiefly represented her in the whole transaction, the plaintiff was told "if the property is condemned or arbitrated you are out altogether." In reply the plaintiff said: "Is that so, all right, sir." Subsequently Mr. Hargest, whose law firm had been retained by Mr. Miller to act for his daughter in the arbitration, made a suggestion to the plaintiff, and with his approval, to Mr. Miller, that the plaintiff also be employed as one of the defendant's counsel in that proceeding. The suggestion was not accepted by Mr. Miller, but he authorized Mr. Hargest to offer the plaintiff a certain amount, which he refused, for the services he had previously rendered.

The purpose of the plaintiff's employment by the defendant was to obtain for her property a designated price from a known prospective purchaser. It was because of the supposed desire of the City of Baltimore to secure the defendant's land as part of the projected airport that there was presented the opportunity for a sale by the defendant and commissions to the plaintiff which the agreement between them was designed to utilize. The service to be performed by the plaintiff, therefore, did not include the discovery of a purchaser, but was simply intended to procure from Baltimore City a stated price for the defendant's property within the specified period. It is with due regard to such a contractual purpose that the plaintiff's claim must be considered. Upon the evidence offered by him, which is the only proof in the record, as the verdict for the defendant was directed at the close of the plaintiff's case, it is certain that the object of his employment was not accomplished. No sale was effected upon the terms or within the time to which he was expressly limited, and the subsequent arbitration resulted, without his sugges-

tion or aid, from the defendant's direct and independent negotiations.

In *Martien v. Baltimore City,* 109 Md. 260, real estate brokers had been employed by the City to negotiate, for a stipulated commission, the purchase of property which the City needed for a public improvement. The negotiations having failed as to the particular property with which that suit was concerned, the owner, to avoid the alternative of condemnation, offered to arbitrate the question of price, and the proposal having been accepted, and the property conveyed to the City for the amount thus determined, the brokers unsuccessfully claimed and sued for commissions on the price paid by the City in pursuance of the arbitrators' decision. In the course of this court's opinion in the case it was said: "The evidence in the case, which we have set out at length, and all of which was produced by the plaintiffs, shows conclusively that all negotiations and dealings between the plaintiffs and Mr. Willis ceased before the 15th of June, 1906, and that the efforts of the plaintiffs to negotiate the purchase of his property by the City had utterly failed; that both the plaintiffs and the Sewerage Commission had abandoned all efforts to secure and all hope of ever reaching an agreement with Mr. Willis in regard to the purchase of the property, and that it was not until a long time thereafter, and until after Mr. Willis had heard that condemnation proceedings were about to be instituted for the purpose of condemning his property, that he went to the Commission himself, and offered to submit the matter to arbitration rather than undergo a condemnation proceeding. Under such circumstances, the acquisition of the property by the City, whether it be regarded as a purchase within the meaning of the terms of the contract or not, was not in any sense the result of the negotiations of the plaintiffs. The right of the plaintiffs to compensation was dependent upon the result of their negotiations. If they failed, and by reason thereof the City was required to resort to other means of acquiring the property, upon what possible grounds can the plaintiffs expect to recover? They did not render the services, viz, 'negotiate the purchase,' for which

6

the City agreed to compensate them. Their effort to do so may be commendable, but their failure defeats their right to recover." After quoting from *Keener v. Harrod,* 2 Md. 70, and *Walker v. Baldwin & Frick,* 106 Md. 634, the opinion said: "In other words, to entitle a broker to recover commissions for the sale or purchase of property, he must not only show his efforts or negotiations to accomplish the sale or purchase, but he must show that the sale or purchase was *accomplished as the result* of such efforts or negotiations."

In deciding the case of *Hill v. Iglehart,* 145 Md. 537, 550, we said, in an opinion by Judge Offutt: "The general rule is that the principal may at any time, before the broker finds a purchaser ready, able and willing to buy the property upon terms satisfactory to the principal, revoke the agency (9 C. J. 563), and that where such revocation is untainted by fraud or bad faith, the broker will not be entitled to commissions even though the principal after the revocation sells the property to a purchaser with whom the broker had been negotiating, and notwithstanding that the broker's efforts may have been the direct and procuring cause of such sale. *Howard v. Street,* 125 Md. 302; *Attrill v. Patterson,* 58 Md. 226; *Beale v. Creswell,* 3 Md. 201."

The revocation of the plaintiff's agency occurred at a time when the City, as the only prospective buyer, had definitely declined to buy the property for the price which the defendant demanded. There is no evidence of any effort by the plaintiff to sell the property after the period to which his contract of employment particularly refers. That agreement did not contemplate the method of valuation and disposition long afterwards adopted by direct negotiations between the defendant and the City. There can be no legitimate imputation of bad faith on the part of the defendant in refusing, under all the circumstances, to extend the plaintiff's agency beyond its original scope and purpose in order that he might receive commissions on a value to be determined by an arbitration which he neither suggested nor promoted. The defendant's inquiry of the plaintiff, a year before the arbitration agreement, as to whether he would accept approximately half com-

missions if arbitration were resorted to, should not be construed as binding the defendant to a recognition of the brokerage claim here asserted, especially when the intimated offer to pay a lower rate of commissions under changed conditions did not meet with an unqualified acceptance by the plaintiff, and he was not thereafter recognized by the defendant, and in fact rendered no service, as her agent, in connection with the proceeding under which the City required the property. In our opinion the trial court was right in ruling that the evidence in the case was legally insufficient to support the alleged cause of action.

*Judgment affirmed, with costs.*