471 A.2d 1079
**Hannah STORCH, et al.**

v.

**Thomas B. RICKER, et al.**

**No. 203, Sept. Term, 1983.**

Court of Special Appeals of Maryland.

March 2, 1984.

Certiorari Denied June 25, 1984.

684

Paul M. Nussbaum and David E. Grover, Greenbelt, with whom were Reichelt, Nussbaum & Brown, Greenbelt, on brief for appellants.

Gary R. Alexander, Oxon Hill, with whom were Haas & Alexander, Oxon Hill, on brief for cross-appellants.

Gary R. Alexander, Oxon Hill, with whom were Haas & Alexander, Oxon Hill, on the brief for appellees.

Paul M. Nussbaum and David E. Grover, Greenbelt, with whom were Reichelt, Nussbaum & Brown, Greenbelt, on brief for cross-appellees.

Argued before BLOOM, BISHOP and GARRITY, JJ.

BISHOP, Judge.

On November 4, 1982, the Circuit Court for Prince George's County entered judgment in favor of plaintiff/appellee, Thomas B. Ricker, a licensed Maryland real estate broker, against Hannah Storch for breach of contract to pay brokerage commissions. It also entered judgment against her brother, Eleazer Hirmes, for tortious interference with that contract. Storch and Hirmes were held liable for $63,113.00 and $5,000.00, respectively, and have appealed. Ricker has cross-appealed.[1]

---

1. Ricker assigned some of his commissions to a corporation, of which he is president, Property Industry Coordinators, Inc., which was included as a plaintiff below and as an appellee/cross-appellant here. For the purposes of this opinion our references to Ricker shall include the assignee. Ricker also agreed to divide his commissions from Storch with a Mr. Spiwak, who helped with the listing and sale of the Storch property. Spiwak has agreed to be bound by the judgment in this case.

## I.

This case involves contracts for the sale of land from its original owner, Mrs. Storch, to an intermediate purchaser, the Rozansky and Kay Construction Company, who later contracted to sell the land to the ultimate purchaser, the KRB Development Company. Ricker was the seller's real estate broker in each contract. As Mrs. Storch's broker, he procured Rozansky and Kay as a purchaser. Later, as Rozansky and Kay's broker, he procured KRB as a purchaser. The gravamen of Ricker's claim is that Storch, with her brother's assistance, sold land to (1) Rozansky and Kay and (2) directly to KRB, without paying him brokerage commissions to which he was entitled.

## A.

After her husband died on February 3, 1972, Hannah Storch acquired his undeveloped commercial property in an area known as Lanham-Seabrook in Prince George's County, Maryland. A tract of approximately 140 acres, zoned for family lots and townhouses, is referred to as the Storch property. Mrs. Storch retained an active role in her own business affairs, but authorized her brother, Eleazer Hirmes, to represent her in the disposition of the Storch property. Hirmes had provided his sister with business advice in the past.

On May 6, 1976, Mrs. Storch signed a real estate listing agreement for the Storch property with Thomas B. Ricker. As a result of Ricker's efforts, Rozansky and Kay Construction Company entered into a residential land purchase agreement (First Contract) with Storch on August 2, 1976, in which it agreed to purchase the property for 2.2 million dollars. The contract provided for settlement on parcels of the property after certain contingencies, "... but in no event later than August 1, 1979, on which date, if Purchaser is not then in default, either party to this Agreement may declare same to have been terminated and the deposit shall be released and returned to Purchaser." This contract provided that Storch would pay Ricker "a Brokerage of 7% of

the purchase price in cash at the time of each settlement as settlements take place in accordance with this Agreement." The contract was assignable.

Shortly after entering into the First Contract, Rozansky and Kay requested that Ricker find a buyer to whom the company could resell the Storch Property. As a result of Ricker's efforts Rozansky and Kay entered into a Second Contract on November 9, 1976, in which it agreed to sell the Storch Property to KRB Development, Inc., for 2.5 million dollars. This resale price was three hundred thousand dollars more than Rozansky and Kay had agreed to pay Storch for the property. The Second Contract excused Rozansky and Kay Construction Company's performance if title to the Storch Property was withheld for any reason under the First Contract. The Second Contract also provided that Rozansky and Kay would pay Ricker a six percent brokerage commission at each settlement.

The resale of the land—known as "flipping—apparently displeased Storch and her brother, Hirmes, for at least two reasons. First, it gave Ricker an additional brokerage commission for obtaining a higher price than he obtained for Storch. Second, all settlements under the First Contract had to be completed by August 1, 1979, whereas the termination date of the Second Contract was December 31, 1980. Storch continually claimed that the Rozansky and Kay Construction Company was violating the First Contract by delaying settlements until parcels of the Storch property could simultaneously be transferred to KRB. All five of the conveyances made before the termination date under the First Contract were directly from Storch to KRB, with Rozansky and Kay receiving the difference between the price it was paying to Storch and the price it was receiving from KRB, and with Ricker receiving commissions from both sellers, as if two separate sales were occurring. Ricker received a six percent commission from Rozansky and Kay, and a seven percent commission from Storch until the November 14, 1978, settlement at which Storch failed to pay Ricker his commission of $2,464.00.

After the November 14 settlement, Ricker's dual commissions and the enhanced purchase price being paid to Rozansky and Kay exacerbated their already acrimonious relationship with Storch. On December 13, 1978, Rozansky and Kay Construction Company filed suit against Storch and Hirmes in the Circuit Court for Prince George's County, charging them with conspiring to oust Rozansky and Kay from its middleman position in order to sell the land directly to KRB Development Company.

In the event of an amicable settlement of the dispute under the two contracts, Rozansky and Kay could have benefited by recovering its $50,000 deposit and by possibly avoiding exposure to an additional $50,000 in liquidated damages and a possible loss of approximately $35,000 in escrow funds under the First Contract; it could also have avoided exposure to a possible multi-million dollar damage claim by KRB for its failure to settle under the terms of the Second Contract.

On August 2, 1979, Storch notified Rozansky and Kay in writing that she was exercising her right to terminate the First Contract as of August 1, 1979. Settlement negotiations ensued involving Storch, Rozansky and Kay, and KRB. Although Ricker tried to insert himself into the settlement negotiations through George A. Brugger, (attorney for Rozansky and Kay and a member of the firm that also represented Ricker) Storch's attorney refused to permit his involvement.

The negotiations led to a Third Contract of September 12, 1979, among the three parties. It provided that Storch would sell the rest of the property to KRB. The Third Contract also recited the existence of the First Contract and the Second Contract, and that the second depended for its performance upon the first. It further pointed out that Storch had "taken action to terminate the First Contract"; referred to the pending litigation regarding both contracts; and concluded in the recital the desires of the parties to settle all their differences and provide for the purchase of

the balance of the Storch Property. In the Third Contract the parties agreed that the First Contract and the Second Contract "shall be null and void" provided that the parties performed under the Third Contract. The operative provision as to Rozansky and Kay provided:

"3. R & K hereby relinquishes any rights it may have under the First Contract or the Second Contract, to any deposits or other monies relating thereto and, in general, releases Storch and KRB from any and all claims and demands whatsoever arising out of or relating to the First Contract and the Second Contract. The relationship of seller and purchaser, as respects the Property, shall be solely between Storch as seller and KRB as purchaser. KRB hereby releases Storch and R & K, and Storch hereby releases R & K and KRB in the same manner and to the same extent as set forth above. It is agreed that Law No. 74,484 in the Circuit Court of Prince Georges County, Maryland, shall be forthwith dismissed with prejudice."

The Third Contract continues:

"4. KRB agrees to buy from Storch, and Storch agrees to sell to KRB the Property for the price and on the terms and conditions hereinafter stated. In addition, Storch grants to KRB and KRB accepts from Storch the sole and exclusive option to purchase the school site, or so much thereof as is available, as hereinafter stated."

With reference to Ricker, Paragraph 10 of the Third Contract provides:

"The parties acknowledge that Thomas B. Ricker, and corporations with which he is affiliated, may assert claims for commissions under the First Contract, the Second Contract, or otherwise. It is acknowledged that KRB is not assuming the responsibility for such commissions, if due or found to be due. It is agreed that if suit be brought by Ricker or his affiliates against KRB then, to the extent such defense may be conducted without an irreconcilable conflict of interest, Storch shall request her

counsel (if KRB shall desire to utilize Storch's counsel) to defend KRB without charge to KRB."

The parties thus put an end to the First and Second Contracts, under which appellee, Ricker, was entitled to commissions. In place of these two contracts, they substituted the Third Contract, which Ricker had not brokered, and under which he was not entitled to commissions.

### B.

Faced with a loss of expected commissions, Ricker filed a four-count declaration on November 8, 1979, in the Circuit Court for Prince George's County against KRB Development, Inc., KRB Development Company, Rozansky and Kay Construction Company (all Maryland corporations), Hannah Storch and Eleazer Hirmes.

Michael T. Rose, President of KRB, testified that Rozansky and Kay had tied their settlements with Storch under the First Contract to their simultaneous settlements with KRB under the Second Contract. Rose pointed out that neither he nor KRB did anything to prevent Rozansky and Kay from settling with Storch under the First Contract, and that he had no conversations with Storch or Hirmes contemplating termination of the First Contract. On the contrary, Rose testified that he did not want the First Contract terminated, but rather wanted Rozansky and Kay to settle with Storch. The attorney for Rozansky and Kay wanted KRB to settle under the Second Contract before August 1979, but KRB refused to do so because it was not required to settle until December 31, 1980. Rose explicitly denied that either he or his attorney was involved in any settlement discussion before August 1979. The attorney for Rozansky and Kay, George Brugger, testified that on June 27, 1979, he learned from KRB's attorney that Hirmes, Hannah Storch's brother, wanted Rozansky and Kay to buy the land on August 2; that Hirmes wanted to pay no further commissions to Ricker; and that if Rozansky and Kay did not

purchase the balance of the property by August 2, KRB would deal with Storch directly.

Since the circuit court attached great evidential weight to Storch's letter of August 2, 1979, terminating her First Contract with Rozansky and Kay, we set it out in its entirety:

Dear Mr. Kay:

Your attention is directed to that certain Residential Land Purchase Agreement of August 2, 1976 between Mrs. Hannah Storch, a client of this firm, and your corporation. Among other provisions, Section 6.Q. of said Agreement clearly states that

'[t]ime is of the essence regarding all terms and conditions of this Agreement.'

Additionally, the second paragraph of Section 3.A. of said Agreement, after setting forth the settlement schedule required of Purchaser, recites that no settlements may occur

'later than August 1, 1979, on which date, if Purchaser is not then in default, either party to this Agreement may declare same to have been terminated and the Deposit shall be released and returned to Purchaser.'

Section 3.G. of the Agreement sets forth the amount of liquidated damages which are to be received by the Seller in the event of a Purchaser's default.

Rozansky & Kay Construction Company has previously instituted litigation in the Circuit Court for Prince George's County against Mrs. Hannah Storch and Mr. Eleazer Hirmes as Defendants; said litigation having been docketed as Law No. 74,484. One of the averments in said litigation is the claim that Mrs. Storch is in default by virtue of an alleged breach of said Agreement. Although this litigation is not at issue as of the date of this writing, your counsel has previously been advised by the undersigned that Mrs. Storch fully intends to assert as a defense, among such other defenses available to her, the fact that the Purchaser designated in said aforementioned

Residential Land Purchase Agreement has been in continuing default in the terms and conditions thereof since at least August 31, 1978. As a matter of fact, numerous prior communications have been issued by this office advising your counsel of the fact that in the opinion of the Seller, said Agreement has been and still is in default. Undoubtedly, the Court will ultimately decide whether or not there was a default by the Purchaser. For this reason, I deem it irrelevant to reiterate your corporation's default at this time. The Court will ultimately order either Mrs. Storch to release and return the deposit or your corporation will be obligated to pay the sum of $100,000 as liquidated damages.

"In any event, however, you should be advised that by and pursuant to the provisions of the Residential Land Purchase Agreement, aforestated, Mrs. Hannah Storch, in the exercise of her rights thereunder, has declared said Contract to be terminated as of Midnight, August 1, 1979."

The court found that although there was a right to terminate the First Contract on August 1, 1979, the above letter did not terminate the contract but "says 'we terminate', and then in the next paragraph says, 'no, we really don't terminate.' We are holding you to the contract. We want damages and we want what in effect is recision." We do not agree with the trial court's interpretation of the termination letter. The second paragraph of Section 3 A of the First Contract gave the right to terminate the contract on August 1, 1979, to either party "if the Purchaser is not then in default" and further in that event the purchaser's deposit would be returned. That provision addressed itself to the failure, through no fault of either of the parties, of the contingencies set out in Section 4 of the contract. This is made clear when the foregoing language contained in Section 3 A is read in conjunction with the language in 4 E:

"E. *Remedies of Purchaser.* If any condition in this Paragraph 4 is not satisfied, Purchaser shall have the right (to be exercised not later than the time scheduled for

settlement) either (i) notwithstanding such fact to proceed to settlement or (ii) to terminate this Agreement and recover the Deposit, whereupon all parties shall be released from any further liability or obligation hereunder. . . . "

Conversely 3 G. provides:

"*Purchaser's Default.* If Purchaser shall, at any time, fail to proceed to a settlement as set forth herein, even though all of the contingencies stated in Para. 4 have been satisfied, Seller shall receive the sum of One Hundred Thousand Dollars ($100,000.00) as liquidated damages, upon payment of which, this Agreement shall terminate and the parties hereto released from any further liability or obligation to each other. Said $100,000.00 in liquidated damages to be paid as follows: the sum of Fifty Thousand Dollars ($50,000.00) then being held in escrow shall be released from escrow and paid to Seller, and furthermore, Purchaser shall pay an additional sum of Fifty Thousand Dollars ($50,000.00) directly to seller. . . . "

We conclude that the letter of August 2nd was an attempt on the part of Storch, through counsel, to cover the pertinent sections of the contract, *i.e.,* Sections 3 A, 3 G and 4 E.

In its opinion the court went on to find that termination "didn't happen in this case because the parties . . . kept right on dealing." While it is accurate that Storch and Rozansky and Kay did continue to deal after the August 2nd letter, that dealing culminated in the Third Contract which, in its effect, released Rozansky and Kay from its responsibility to Storch under the First Contract and from its responsibility to KRB under the Second Contract. The Third Contract ultimately resulted in a deal between Storch and KRB, the two parties between whom there had been no privity of contract. The "dealing" to which the court referred was the concluding stage of the negotiations that had begun some months before in efforts to settle the law suit between Rozansky and Kay and Storch under the First Contract, and

other serious problems between Rozansky and Kay and KRB under the Second Contract.

In addition to finding that the First Contract was not terminated on August 1, 1979, the court found that there were legitimate differences among the parties to the first two contracts; that the litigation was not a sham, the purpose of which was to prevent Ricker from collecting his commissions, but that ultimately the dealings of the parties were handled in such a way as to circumvent the paying of a commission to Ricker. The court found that the parties settled knowing that "Ricker had intervened and was claiming his commission;" that the meeting of August 9, 1979, which ultimately resulted in the Third Contract, was motivated by Ricker's intervention and that the settlement thwarted Ricker's "having his day in court." The court thereafter concluded that the parties "acted in concert in an attempt to thwart Mr. Ricker and his organization from collecting their justly earned commissions...".

The trial court found that the meeting among the parties held on August 9, 1979, at the Sheraton Hotel in Lanham was triggered by Ricker's Motion to Intervene, which was mailed to counsel on August 7th and filed on August 8, 1979. The court attached significance to its finding of fact that the parties settled knowing that Ricker "had intervened and was claiming his commission," and that the subsequent dismissal of the court action prevented Ricker's "having his day in court." Finally, the court concluded that the "parties vendor purchasers" (sic) to the First and Second Contract "acted in concert in an attempt to thwart Mr. Ricker and his organization from collecting their justly earned commissions." The court concluded that "there was a settlement of the two exterior contracts, enough to trigger for Mr. Ricker and his organization payment in full of their commission on September 12, 1979, when Mrs. Storch and Mr. Kay and Mr. Rose finally had all of their signatures on the contract."

On Count I, breach of contract, the court entered judgments against Hannah Storch ($63,113.00) and against Ro-

zansky and Kay Construction Company ($51,698.00), the only defendants named in that count. The court granted a defendants' verdict on Count II since this count, involving a promissory note executed by Rozansky and Kay Construction Company in favor of Ricker, was merged into Count I. Count III (fraud-conspiracy-punitive damages) was concluded with defendants' verdicts. On Count IV (tortious interference with contract rights), the court found in favor of the plaintiff and entered a judgment against Hirmes in the amount of $5,000.00. Also at the conclusion of the trial the court granted summary judgment in favor of all of the defendants as to punitive damage claims in Counts III and IV. Count V, which was included in a January 26, 1982 amendment to the declaration, was based on a breach of the brokerage agreement between Ricker and Storch. The court merged it with Count I, and granted a defendants' verdict "without prejudice to the plaintiff to seek proper relief in the event a new trial is ordered."

Rozansky and Kay Construction Company filed an appeal, but subsequently settled with the appellees, thereafter dismissing its appeal. No judgment was entered against KRB. Plaintiffs' and defendants' pretrial motions for summary judgments were denied. Appellant Ricker's motion for summary judgment made at the end of the plaintiff's case on Counts I and V was likewise denied.

## II.

Appellants challenge the trial court's rulings that (A) Storch breached her contract to pay Ricker commissions and that (B) Hirmes, acting to help his sister, tortiously interfered with Ricker's contract rights.

## A.

### *Breach of Contract*

Appellant Storch asks whether the trial court clearly erred when it made the following findings:

—that the First Contract was not terminated on August 1, 1979;

—that since Ricker had brought the three parties together, he was the procuring cause of the Third Contract

—and that Ricker was entitled to a commission from Storch when she sold the remaining property to KRB under the Third Contract.

This case poses an issue very similar to the one posed by Judge Cole for the Court of Appeals in *DeFranceaux Realty Corp. v. Leeth,* 283 Md. 611, 613, 391 A.2d 1209 (1978):

> "The real issue presented by this case is whether the brokers are entitled to a commission of 10% of the purchase price when the purchaser would not finalize the sale and when the sellers settled the ensuing dispute with the purchaser out of court."

In *DeFranceaux* the purchaser failed to settle after the required contingencies had happened. The seller brought suit against the purchaser for specific performance. The brokers were joined as plaintiffs. The original parties settled the suit; the seller dismissed the action for specific performance in exchange for engineering and architectural studies completed by the purchaser in preparation for property settlement. The brokers were not advised of the agreement, and an order dismissing the case was entered. The brokers then sued the sellers for their commission. The contract provided that the sellers agreed to pay the brokers ten percent of the gross sale price, to be deducted from the proceeds of the sale. The Court observed that under section 14–105 of the Real Property article, the broker is entitled to his commission upon the signing of the sales contract unless there is a special agreement to the contrary. *Id.* at 614, 618, 391 A.2d 1209.

■ *Accord Childs v. Ragonese,* 296 Md. 130, 133, 460 A.2d 1031 (1983); *Prince George's Prop. v. Rogers,* 275 Md. 582, 595–96, 341 A.2d 804 (1975); *Berman v. Hall,* 275 Md. 434, 437–38, 340 A.2d 251 (1975); *Chasanow v. Willcox,* 220 Md. 171, 176, 151 A.2d 748 (1959). *See generally* Note, 36 U.Md.

L.Rev. 372 et seq. (1976). As long as the terms of the special agreement are explicit and unambiguous, they control when the broker is entitled to commissions. *Id.* 283 Md. at 615–16, 391 A.2d 1209, *quoting W.C. Pinkard & Co. v. Castlewood,* 271 Md. 598, 601, 319 A.2d 123 (1974).

■ The special agreement may make a consummated sale of real estate a condition precedent to payment of the brokerage commission. *Id.; Prince George's Prop. v. Rogers, supra,* 275 Md. at 594, 341 A.2d 804 (1975); *Prince George's Country Club v. Carr,* 235 Md. 591, 603–04, 606, 202 A.2d 354 (1964). *See generally,* Note, 36 Md.L.Rev. 372, 375–76 (1976); 12 Am.Jur.2d *Brokers* § 195 (1964); 12 A.L.R. 4th 1983, § 12 (1982). The following discussion by the *DeFranceaux* Court of *Berman v. Hall,* 275 Md. 434, 340 A.2d 251 (1975) is most germane to the case before us.

> "In *Berman,* the contract of sale included a term which provided that the broker's commission would be 'due and payable upon the settlement of this Contract . . .' and directed the party making settlement 'to deduct the aforesaid commission from the proceeds of the sale and pay same to said Agent.' *Id.* at 435 [340 A.2d 251]. At the time of settlement, the purchaser's attorney raised certain title objections and settlement was postponed while the sellers cleared the title. However, the settlement did not take place because the sellers and the purchaser executed a 'mutual release' releasing 'each other from any and all obligations arising out of the Contract.' *Id.* at 435–36 [340 A.2d 251]. The broker then sued to recover his commission, claiming that he became entitled to his full commission upon the execution of the contract of sale. This Court held that the specific agreement between the buyer and seller regarding the payment of the broker's commission was controlling. Judge Eldridge, writing for the Court, stated:
>
>> The broker's argument ignores the plain meaning of the contract language. . . . If the commission is not

*due* until settlement, and not *payable* until then, the right to it clearly does not accrue until settlement.

\* \* \* \* \* \*

Since, under the factual allegations of the broker's amended declaration . . . , the broker was not entitled to a commission unless settlement occurred or unless the purchaser defaulted . . . , and since neither of these contingencies happened, the circuit court correctly sustained the demurrer. [*Id.* at 438–39, 440–41, 340 A.2d 251]."

283 Md. at 616–17, 391 A.2d 1209.

The comparable provision in the First Contract in the case before us provides:

"Seller agrees to pay Thomas B. Ricker a Brokerage of 7% of the purchase price in cash at the time of each settlement *as settlements take place in accordance with this Agreement.*" (Emphasis supplied.)

The provision in the First Contract tying appellee Ricker's commissions to settlement under that contract is a special agreement, the terms of which prevail over the general rule. Unlike *DeFranceaux,* in which the brokers stipulated that there was a special agreement tying commissions to sales, Ricker contends that his listing contract of May 16, 1976, standing alone, entitled him to the claimed commissions. We do not agree and hold that the law as explicated in *DeFranceaux, supra,* is dispositive. If the First Contract terminated on August 1, 1979, because of the failure of Rozansky and Kay to settle by that date, then it follows that the ultimate sales and settlements of the remaining parcels were not "in accordance with this Agreement," and Ricker would not be entitled to commissions on the sales of those parcels.

"This Court has consistently looked to the terms of the contract in determining the right of the broker to receive commissions.

\* \* \* \* \* \*

When brokers such as the appellant voluntarily take themselves outside the statute by signing a contract which has been construed to provide for payment of commissions from the proceeds of sale at settlement, they must abide by the terms of that arms' length agreement."

*DeFranceaux Realty Group v. Leeth, supra,* 283 Md. at 615, 618, 391 A.2d 1209.

The case *sub judice* differs from *Berman* and *DeFranceaux* because here the seller, Storch, ultimately sold the property to a purchaser, KRB, that had been procured by the broker. Ricker, however, procured KRB for Rozansky and Kay, not Storch. He is not entitled to a commission for the Third Contract simply because his actions indirectly acquainted Storch with KRB. It is not sufficient that the broker has merely "planted the seed from which the harvest was reaped." *Leimbach v. Nicholson,* 219 Md. 440, 446, 149 A.2d 411 (1959) *quoted in Hampton Park v. T.D. Burgess Co.,* 270 Md. 269, 282, 311 A.2d 35 (1973). If Ricker is entitled to a commission from Storch, it must be due under the terms of the First Contract. We have held that the First Contract was terminated by the letter written by Storch's attorney on August 2, 1979; settlement on the remaining parcels did not take place under the First Contract, but the Third.

The question then is whether Storch colluded with Rozansky and Kay and KRB to prevent Ricker from collecting commissions from her by replacing the First Contract with the Third.

The *DeFranceaux* Court, affirming the trial court's grant of a directed verdict for the seller, concluded:

"Here the brokers have made no showing in the record that fraud or duress surrounded the signing of the contract of sale, *nor have they shown that the sellers and purchasers later worked in collusion to settle their differences out of court in order to deprive the brokers of their commission.* Absent such a showing, we will not rewrite a contract now to suit parties which had ample opportunity

to bargain for contract terms which would have been more favorable to their interests." (Emphasis added.) 283 Md. at 618.

A broker's claim that his customer has engaged in bad faith collusion to avoid paying his commission may be negated by a showing of other circumstances that prevented consummation of the contract. In *Development Sales Company v. McWilliams*, 254 Md. 673, 255 A.2d 1 (1969), the buyer and seller agreed to convey a tract of land if it was rezoned within 18 months after they signed the sales contract. It was not, and the parties entered into a new contract without the assistance of the brokerage company that had procured the original customer. The brokerage company sued the sellers for its claimed commission, but the trial court directed a verdict against it. The Court of Appeals affirmed, stating:

"[T]he contract terminated according to its own terms and provisions when the zoning classification sought for had not been obtained within 18 months from the date of the contract, and no consent to extend the contract or to further pursue the zoning reclassification was forthcoming from the McWilliamses. The contract was predicated on a contingency which was not fulfilled. Thereafter, the McWilliamses, as sellers, were free to negotiate with whomsoever they may have chosen to negotiate a new contract.

We find very broad language in the oft cited case of *Hill v. Iglehart*, 145 Md. 537, 125 A. 843 (1924) as to the freedom of activity accorded the owner of real estate to negotiate a new contract upon the failure of a former contract to reach consummation:

' * * * [W]here such revocation is untainted by fraud or bad faith, the broker will not be entitled to commission even though the principal after the revocation sells the property to a purchaser with whom the broker had been negotiating, and notwithstanding that the broker's efforts may have been the direct and procuring cause of such sale. *Howard v. Street*, 125 Md. [289] 302; *Attrill*

*v. Patterson,* 58 Md. 226; *Beale v. Creswell,* 3 Md. [196] 201.' Id. at 550–[51, 125 A. 843]."

*Id.* 283 Md. at 678–79, 391 A.2d 1209. *See also Snedker v. Baltimore Brick Co.,* 198 Md. 499, 84 A.2d 868 (1951); *Staylor v. Stenger,* 160 Md. 1, 152 A. 362 (1930). *See generally* 12 Am.Jur.2d *Brokers* §§ 216, 222 (1964). Similarly, in this case Storch's termination of the First Contract may be attributed to reasons entirely independent of her desire to avoid paying brokerage commissions.

The settlement meetings were infused with major arguments about the tract's total acreage, methods of computing purchase price, uncompleted contractual contingencies such as sewer authorization and implementation, and numerous other large and small matters that underpinned the property's transfer.

Insofar as the parties had sufficient reasons—totally independent of their desire to avoid commission—to substitute the Third Contract for the first two, their action did not constitute the sort of bad faith collusion that would entitle Ricker to recompense. Given the existence of these independent, sufficient reasons for termination of the First Contract, the fact that Storch may indeed have also wanted to avoid paying commissions does not mean that she acted in bad faith. A finding that she lacked sufficient other reasons to terminate the First Contract would be clearly erroneous. Md.Rule 1086. *See Dev. Sales Co. v. McWilliams, supra,* 254 Md. at 680, 255 A.2d 10.

Ricker is consequently not entitled to the additional $60,-649.00 in commissions he would have earned had all of the Storch property been sold under the First Contract. He is nonetheless entitled to a commission of $2,464.00 for the settlement of November 14, 1978, which took place before the First Contract was terminated.

B.

*Tortious Interference*

The fourth count of Ricker's declaration alleged that the defendants tortiously interfered with his right to receive

commissions under the First and Second Contracts by substituting the third. The trial court ruled that the parties to the contracts could not be held liable for tortious interference. *Wilmington Trust Co. v. Clark,* 289 Md. 313, 329–30, 424 A.2d 744 (1981); *Continental Cas. Co. v. Mirabile,* 52 Md.App. 387, 402, 449 A.2d 1176 (1982). The court did rule, though, that Hirmes's participation in the settlement negotiations and advice to his sister encouraging formation of the Third Contract constituted an improper inducement to breach. In his oral opinion, the court opined that Hirmes had engaged in the illegal practice of law, and that his relationship to Mrs. Storch did not privilege him to counsel breach of contract.

The tort of improper interference with contract comprises the following elements:

"(1) The existence of a contract or a legally protected interest between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional inducement of the third party to breach or otherwise render impossible the performance of the contract; (4) without justification on the part of the defendants; (5) the subsequent breach by the third party; and (6) damages to the plaintiff resulting therefrom."

3. J. Dooley, *Modern Tort Law,* § 44.03 (1977). *See also Wilmington Trust Co. v. Clark, supra,* 289 Md. at 329, 424 A.2d 744; *United Rental Equipment Co. v. Potts & Callahan Contracting Co.,* 231 Md. 552, 560, 191 A.2d 570 (1963); *Restatement (Second) Torts* § 766 (1979).

■ The element of breach is lacking in this case. Due to the aforementioned difficulties among the parties, Storch terminated the First Contract, as she was entitled to do. This left Rozansky and Kay with no land to transfer to KRB. The Second Contract excused performance if the land could not be obtained under the first. As a result, the parties were not obligated to make further settlements under either contract, and Ricker was not entitled to further commissions. This cause of action requires breach of a

contractual right or obligation. *Lake Shore Investors v. Rite Aid Corp.,* 55 Md.App. 171, 461 A.2d 725, *cert. granted* 297 Md. 171, 465 A.2d 1161 (1983). *Wilmington Trust Co. v. Clark, supra,* 289 Md. at 329, 424 A.2d 744 (1981); *Horn v. Seth,* 201 Md. 589, 593, 95 A.2d 312 (1953). *But see Goldman v. Building Ass'n,* 150 Md. 677, 681, 133 A. 843 (1926) (termination of employment contract at will induced by improper means).

Furthermore, even if there were a breach, Hirmes's actions were nonetheless proper. He simply gave advice to his relative in response to her request, Restatement (Second) of Torts, §§ 772, 767 Comment i (1979); 45 Am.Jur.2d *Interference* § 34 (1969); W. Prosser, *Law of Torts,* 934, 944 (1971), and acted as her agent during settlement conferences. *Continental Cas. Co. v. Mirabile, supra,* 52 Md.App. at 402, 449 A.2d 1176. Consequently, he cannot be held liable for tortious interference with contractual rights.

### III.

#### *Cross Appeal*

Ricker asseverates that the trial court erred (a) by failing to grant his motion for summary judgment, (b) by awarding insufficient damages for Hirmes's tortious interference with his contract rights, and (c) by failing to assess damages for the appellants' conspiracy to deprive him of his commission.

 Based on our above holdings, we will not address the three issues raised by Ricker except to point out that when, after the denial of a motion for summary judgment made by the plaintiff during trial, the case proceeds to a verdict in favor of the plaintiff, this Court will not review the denial of the summary judgment. *Rowe v. Baltimore Colts,* 53 Md.App. 526, 454 A.2d 872 (1983).

JUDGMENTS VACATED; CROSS–APPEAL DISMISSED AND CASE REMANDED FOR ENTRY OF JUDGMENT IN ACCORDANCE WITH THIS OPINION.

COSTS TO BE PAID 80% BY APPELLEES, 20% BY APPELLANTS.